THIRD DIVISION

May 1, 2002

No. 1-99-4233

THE PEOPLE OF THE STATE OF ILLINOIS, )   Appeal from the

)   Circuit Court of

Plaintiff-Appellee, )   Cook County. )

v. )                   

) 

HARRY McDONALD, )   Honorable 

)   Stanley J. Sacks,

Defendant-Appellant. )   Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court:

Between December 1993 and May 1995, defendant Harry McDonald lived in a second floor apartment at 5941 West North Avenue in Chicago.  He lived alone, in apartment #204.  He was in his forties and had long suffered from paranoid schizophrenia.  

On May 6, 1995, the defendant set fire to a third floor apartment, #303, in his building.  Eric West, Hardell Preston, and their three young children, Erica, Eric Jr., and Edonya, lived in that third floor apartment.  Vera Holmes lived in another apartment on the third floor. 

The defendant was charged with four counts of first degree murder for the deaths of Vera Holmes, Erica West, Edonya West, and Eric West, Jr., and one count of aggravated arson.  A jury later found the defendant guilty but mentally ill of the four counts of first degree murder and of the one count of aggravated arson.

Following the jury trial, the trial judge sentenced the defendant to life in prison without the possibility of parole for each of the four first degree murder convictions and to a consecutive term of thirty years in prison for the aggravated arson conviction.

On appeal, the defendant contends (1) the jury's determination he was sane was against the manifest weight of the evidence.  He also contends the trial court abused its discretion when it (2) denied his request to give his diaries to the jury during its deliberation; (3) limited his cross-examination of the State's expert, forensic psychiatrist Dr. Albert Stipes; (4) denied his request for second degree murder instructions; (5) denied his request for a non-IPI instruction recognizing the consequence of a verdict of not guilty by reason of insanity; and (6) refused to allow him to argue last -- in a rebuttal closing argument -- the issue of his sanity.

We affirm.

FACTS

The State's evidence at trial showed the defendant set fire to Eric West's apartment on May 6, 1995, because of a growing animosity between him and Eric, and because he suffered from a delusion that demons disguised as people, including Eric and his family, were stalking him, breaking into his apartment, and trying to kill him.

Specifically, nine months earlier, on August 17, 1994, the defendant got into a fight with Eric near the entrance to their apartment building.  After that fight, the defendant intended to use a shotgun to kill Eric.  

The defendant failed to buy a shotgun, however.  His application for a firearm owner's identification card was denied.  So the defendant decided to use fire to kill Eric.

On February 15, 1995, the defendant and Eric got into another fight.  During that fight, the defendant repeatedly stabbed Eric with a homemade knife -- a broomstick handle with a nail driven into it.  He stabbed Eric in his back and head.  

Hardell Preston saw the defendant attack Eric and tried to pull Eric away from the defendant.  After some time, Eric was able to break away from the defendant and escape through the front door of the building.  

Later that night, the police arrested the defendant for attacking Eric.  The defendant was charged with battery and the case against him was set for trial.  Eric and Hardell were scheduled to testify.

While in custody, the defendant tried to file a complaint against Eric.  According to the defendant, the police refused to accept his complaint.  As a result, the defendant decided to burn his whole apartment building.  This way, he could kill Eric and everyone else in the building.  He later decided, however, not to burn down the entire building.  He did not think he could acquire enough gasoline to burn it all.

During the days between February 15, 1995, and April 4, 1995, the defendant went to the Chicago Public Library and researched how to use and control gasoline.  He wanted to learn how to burn the building.  Apparently, he did.  After midnight on April 4, 1995, the defendant bought over two gallons of gasoline. 

The defendant put the gasoline in a plastic container and took it home.  When he returned to his apartment with the gasoline, he kept his window open and a fan running to clear the gasoline fumes.  He was afraid the gasoline would catch fire before he had a chance to use it.

Eventually, the defendant had to transfer the gasoline to a larger 2.5-gallon plastic bottle -- the plastic container and the lid on the container softened.  He then placed the plastic bottle into a 5-gallon plastic "Open Pit" barbeque sauce bucket.  He got the bucket from the garbage of Joe's Barbecue -- a local restaurant located next to his building.

In the days before setting apartment #303 on fire, the defendant made some preparations.  Specifically, he withdrew money from his bank account, over $8,000, he packed a bag with some of his personal items, and he grabbed some matches.

At 4:00 a.m., on May 6, 1995, the defendant carried his money, bags, matches, and the bucket of gasoline up the stairs to apartment #303 -- Eric's apartment.  The defendant chose that time because he thought that at four in the morning Eric would be asleep in his apartment.  

Eric was not in the apartment.  Eric had just left.  He went to Joe's Barbecue to help clean up and make a little money.  Joe's Barbecue closed at 4:00 a.m.

Hardell and her three children were in the apartment, however.  Hardell was lying on the couch watching television.  Her three children were sleeping.  Apartment #303 was a studio, so Hardell and her children were in the same room: Erica, age four, was sleeping on the couch and was closest to the front door of the apartment; Edonya, age three, was sleeping on another couch next to Hardell; and Eric Jr., age two, was sleeping next to his mother, that is, with Hardell.

Just minutes after Eric left for Joe's Barbecue, the defendant banged on the front door to apartment #303.  Hardell yelled out, but there was no response.  She then went into the bathroom and partially closed the bathroom door.

The defendant broke the apartment door open.  He emptied the gasoline from the 2.5-gallon plastic bottle, which he had in the "Open Pit" bucket, into the apartment.  He poured the gasoline in such a way that the gasoline spread all over the floor of the apartment.

The defendant then lit one match.  The gasoline did not catch fire.  He lit a second match.  The gasoline still did not catch fire.  Finally, he lit a third match, and the gasoline ignited. 

When the gasoline ignited, fire swept across the floor of the apartment and leapt to the ceiling.  The fire engulfed the whole room.  "It was like the sun in the apartment," said Hardell.

As the flames spread through the apartment, the children woke up and started to scream.  Erica tried to run out the front door, but the defendant pushed her back into the apartment and closed the front door.  Hardell fully opened the bathroom door to see if she could reach her children.  

Erica saw her mother and tried to run to her.  Because of the intense heat of the fire -- between 1,800 and 2,000 degrees Fahrenheit -- Erica was unable to reach her mother.  And Hardell was unable to rescue her.  Hardell was unable to rescue any of her children.

Feeling helpless, Hardell jumped out of the bathroom window to the rooftop of a one-story building next to the apartment building.  When she landed on the rooftop, she broke her wrist and elbow.  From the rooftop, Hardell yelled for someone to help her children.  She could hear them screaming from within the apartment.

The children were not saved from the fire.  They died in the apartment and were burned beyond recognition.

As the fire spread throughout the building, other residents of the building jumped out of their windows or were rescued by firefighters.  Vera Holmes was one of those residents.  She also lived on the third floor of the apartment building.

To avoid the fire and smoke that engulfed her apartment, Vera climbed out of her window and straddled the window ledge.  Firefighter Darien Thomas and several other firefighters from the Chicago fire department tried to rescue Vera.  However, she fell from the ledge and landed on firefighter Thomas.  Because of the combination of her fall and carbon monoxide intoxication (she inhaled too much smoke and soot from the fire), Vera died from her injuries.

After setting fire to Eric's apartment, the defendant fled.  He gathered his suitcase and the "Open Pit" bucket -- he left the 2.5-gallon plastic bottle in Eric's apartment -- and left the apartment building through the front door.

The defendant ran to the rear of the building.  He went into an alley and threw the "Open Pit" bucket into a garbage container.  Officer Barry Eichner of the Chicago Police Department recovered the "Open Pit" bucket and three plastic cigarette lighters from that garbage container.  A latent fingerprint on the "Open Pit" bucket matched the defendant's middle finger on his left hand.

After throwing away the "Open Pit" bucket, the defendant walked to the Greyhound bus station.  There, he bought a bus ticket to California.  He used a fake name to buy the ticket.  

The defendant did not go to California.  Instead, he bought bus tickets for several different places.  He estimated he spent about $1,000 on bus tickets.  

From May 6, 1995, to June 10, 1995, the police tried to locate the defendant.  During that time, the defendant missed his monthly appointments at Mt. Sinai hospital.  He had been treated there on an outpatient basis since 1989 for paranoid schizophrenia.  His missed appointments at Mt. Sinai were the first he had missed in over five years, having attended all previous 67 appointments.

On May 8, 1995, Chicago police detective Jerome Bogucki went to the defendant's apartment.  He found the defendant's apartment door open.  When he looked in, the detective saw an open closet with 5-gallon "Open Pit" barbecue sauce buckets on the shelves.  

On May 9, 1995, a search warrant was issued for the defendant's apartment.  Detective Bogucki and other detectives searched the defendant's apartment.  In addition to the "Open Pit" buckets, the detective recovered a number of spiral binder notebooks with writing in them that detailed the defendant's delusions, advertisements from the Yellow Pages with handwriting on the back, 3-ring binders, a manila folder, homemade weapons made from wooden spikes, electrical timers, electrical wire, a .22 rifle, and parts for another .22 rifle.

On June 10, 1995, Chicago police arrested the defendant.  When he was arrested, he held a bus ticket for travel departing from Miami, Florida, on June 7, 1995, and arriving in Chicago, Illinois, on June 9, 1995.  The name on the ticket was "Joe Doss."

In the four years leading up to the defendant's trial, three doctors examined him: Dr. Heinrich, a psychologist retained by the defendant; Dr. Obolsky, a psychiatrist also retained by the defendant; and Dr. Stipes, a psychiatrist employed by Forensic Clinical Services of the Cook County Circuit Court.  

At the defendant's trial, all three doctors testified as expert witnesses regarding the issue of his sanity at the time he set fire to apartment #303.  All three doctors agreed: (1) the defendant suffered from paranoid schizophrenia; (2) the defendant was suffering from paranoid schizophrenia on May 5 and May 6, 1995, and had suffered from it for many years; and (3) the defendant was delusional on May 5 and May 6, 1995.

Both Dr. Heinrich and Dr. Obolsky reached the opinion the defendant was insane at the time he set fire to Eric West's apartment because his mental illness and his delusions deprived him of the substantial capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law.  

Specifically, Dr. Heinrich and Dr. Obolsky believed the defendant's paranoid schizophrenia caused him to think he was the target of a universal conspiracy in which God, the Devil, and all of mankind, including the police and judges, conspired to destroy him.  The defendant believed he was left with no choice other than to try to eliminate his foremost and easily identifiable conspirators: Eric West and his family.

Dr. Stipes, however, reached the opposite conclusion.  He opined the defendant was sane.  

Dr. Stipes believed the defendant's notebooks reflected planning and organization of his crime, an important factor to consider in determining a person's sanity, said Dr. Stipes.  Dr. Stipes also believed the defendant's flight from the scene of the fire evinced not only planning and organization, but also consciousness of guilt -- another important factor to consider in determining a person's sanity. 

Dr. Stipes concluded that in light of the defendant's Mt. Sinai records closest in time to the fire and the interviews he had with him, the defendant's planning of the fire, his motives, and his attempts to avoid detection showed he was legally sane when he set fire to Eric West's apartment, killing the four victims.

At the close of all of the evidence, the trial court conducted an instructions conference and an exhibits conference.  First, in the instructions conference, the defendant objected to any guilty but mentally ill instructions or verdicts.  The defendant objected to the guilty verdict forms because the evidence did not support "unalloyed guilty verdicts."  The trial court overruled the defendant's objections and submitted the instructions to the jury.

Second, in the instructions conference, the defendant offered instructions on second degree murder, predicated on his genuinely held, but unreasonable belief he needed to defend himself from death or a forcible felony.  The defendant offered companion instructions on reasonable belief and justified use of force, necessity, and self-defense.  The trial court denied them all.

Finally, in the instructions conference, the defendant offered a non-IPI instruction on the consequences of a verdict of not guilty by reason of insanity.  This also was denied.

In the exhibits conference, the defendant requested his notebooks taken from his apartment be given to the jury.  The State objected and the trial court sustained the objection.  The trial court said the blow-ups of various pages from the notebooks the experts testified to would go back to the jury only if the jury asked for them.  The court added it would reconsider its ruling on the notebooks if the jury were to ask for them.  The jury never requested either the blow-ups or the notebooks.

Before closing arguments, the defendant also asked the court to give him final rebuttal argument, since he had the burden of proof on the issue of his sanity.  The trial court refused.  After the State's argument, the defendant waived his closing argument.

The defendant now appeals his convictions for first degree murder and aggravated arson.

DECISION

SANITY

At the time the defendant committed the offenses, section 6-2 of the Criminal Code of 1961 said a defendant may not be convicted if "at the time of such conduct, as a result of mental disease or mental defect, he lack[ed] substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."  720 ILCS 5/6 2(a) (West 1994).  

In Illinois, all defendants are presumed to be sane.  
People v. Williams
, 265 Ill. App. 3d 283, 289, 638 N.E.2d 345 (1994).  The burden is on the defendant to prove insanity by a preponderance of the evidence.  720 ILCS 5/6 2(e) (West 1994).  That is, the defendant must prove that it was more likely than not that he was insane when he committed the murder.  See 
People v. Moore
, 147 Ill. App. 3d 881, 886, 498 N.E.2d 701 (1986).

Whether a defendant was sane at the time of a crime is generally a question of fact.  
People v. Martin
, 166 Ill. App. 3d 428, 433, 519 N.E.2d 1085 (1988).  The trier of fact may accept the testimony of one expert over that of another as long as the accepted opinion is based on a credible diagnosis.  
People v. Tylkowski
, 171 Ill. App. 3d 93, 100, 524 N.E.2d 1112 (1988).  We will not reverse the trier of fact's determination of the defendant's sanity unless it is contrary to the manifest weight of the evidence.  
People v. Thurman
, 223 Ill. App. 3d 196, 201, 584 N.E.2d 1069 (1991); see also 
People v. Wilhoite
, 228 Ill. App. 3d 12, 20, 592 N.E.2d 48 (1991).

The defendant contends the jury's decision he was sane at the time he set fire to apartment #303 is against the manifest weight of the evidence.  Specifically, the defendant contends Dr. Heinrich's and Dr. Obolsky's opinions he was insane at the time of the crime were amply supported by (1) the defendant's notebooks; (2) interviews with the defendant; (3) relevant police reports; (4) the defendant's statements to the police and to an Assistant State's Attorney; and (5) the defendant's medical records.  The jury erred in finding him guilty but mentally ill rather then legally insane, says the defendant.

The State responds the jury was within its province as fact-finder to reject the conclusions of Dr. Heinrich and Dr. Obolsky.  The jury can rest its finding the defendant was not insane solely on the testimony of Dr. Stipes.  He supported his opinion with the same information Dr. Heinrich and Dr. Obolsky did, says the State.  We agree.  

A jury, in making its determination, is free to accept the opinion of one expert witness over another (
People v. Moore
, 147 Ill. App. 3d 881, 886, 498 N.E.2d 701 (1986)), or accept part and reject part of each expert's testimony (
People v. McCleary
, 208 Ill. App. 3d 466, 478-79, 567 N.E.2d 434 (1990).  The relative weight to be given an expert witness' opinion "is measured by the reasons given for the conclusion and the factual details supporting it."  
Wilhoite
, 228 Ill. App. 3d at 20-21.  

We do not find grounds to reverse the jury's decision.  Although the expert testimony conflicted, the jury was under no obligation to accept Dr. Heinrich's and Dr. Obolsky's conclusions over Dr. Stipes' conclusions.  See 
Williams
, 265 Ill. App. 3d at 289. 

The defendant relies on 
People v. Baker
, 253 Ill. App. 3d 15, 625 N.E.2d 719 (1993).  In 
Baker
, we held the trial court's findings were against the manifest weight of the evidence where there was "no basis" to reject the testimony of four expert witnesses for the defense, three of whom -– including Dr. Stipes -- were employed by the circuit court of Cook County Psychiatric Institute and were designated by the trial court to examine the defendant.  
Baker
, 253 Ill. App. 3d at 29-30.  No experts testified on behalf of the State.  We found the lay evidence tilting toward the State tenuous in light of the unimpeached testimony and conclusions of the experts.  
Baker
, 253 Ill. App. 3d at 28-31.

This case is not like 
Baker
.  Here, each expert testified he considered all the available information on the defendant's condition.  As the State's rebuttal witness, Dr. Stipes simply disagreed with Dr. Heinrich's and Dr. Obolsky's conclusions.  The defendant did not hire Dr. Stipes to examine him and then provide an opinion at trial.  See 
Baker
, 253 Ill. App. 3d at 30.

"It is in a situation just such as this, when it is not entirely clear who is correct, that deference to the judgment of the trial court is most appropriate.  'That the witnesses reached different medical conclusions based upon the same foundational evidence does not mean defendant sustained his burden of proof or that the State failed to carry its burden.  * * *  The contradictory expert opinion presented the trial judge with a classic question of fact.' "  
People v. Hill
, 297 Ill. App. 3d 500, 518, 697 N.E.2d 316 (1998), quoting 
People v. Sojak
, 273 Ill. App. 3d 579, 588, 652 N.E.2d 1061 (1995).  

We find the jury's rejection of the defendant's insanity defense was not against the manifest weight of the evidence.

DIARIES

The defendant contends the trial court should have allowed his request to give the jury his diaries during deliberations.  We disagree.

The decision whether to allow jurors to take exhibits into the jury room is left to the sound discretion of the trial court.  
People v. Hunley
, 313 Ill. App. 3d 16, 37-38, 728 N.E.2d 1183 (2000).  We will not reverse that decision unless there is an abuse of discretion to the prejudice of the defendant.  
Hunley
, 313 Ill. App. 3d at 37-38; see also 
People v. Williams
; 97 Ill. 2d 252, 292, 454 N.E.2d 220 (1983).

The situation here is similar to that in 
People v. Glenn
, 233 Ill. App. 3d 666, 599 N.E.2d 1220 (19921), and 
People v. Panzer
, 73 Ill. App. 3d 1, 391 N.E.2d 467 (1979).

In 
Glenn
, we held the trial court did not abuse its discretion in refusing to allow defense exhibits to go to jury room where both parties' experts reviewed exhibits in formulating their insanity opinions and the defendant was allowed to display exhibits to the jury during closing argument.  233 Ill. App. 3d at 686.

In 
Panzer
, we held the trial court did not abuse its discretion in refusing to allow a defendant's statement to go to the jury where the statement was admitted into evidence and was read to the jury.  The trial court determined undue emphasis would be placed on one piece of evidence: the defendant's statement.  73 Ill. App. 3d at 8-9.

Here, the defendant's diaries contained information that was helpful to both the defense -- as evidence of his delusions -- and the State -- as evidence of motive, planning, and organization of his crime.  As such, the jury heard extensive testimony and analysis regarding the contents of the diaries from Dr. Heinrich, Dr. Obolsky, and Dr. Stipes, and heard how those entries influenced their opinions regarding the defendant's sanity at the time of the offense.  We note the jury made no request to have the diaries during its deliberation process.  

Based on the record, we find the trial court did not abuse its discretion by refusing to allow the defendant's diaries to go back to the jury during deliberations.  See 
Hunley
, 313 Ill. App. 3d at 37-38 (failure to admit transcript of defendant's 911 call into evidence and to send it back to the jury during deliberations was not an abuse of discretion where jurors had the benefit of using the transcript while the tape recording of call was played in court, and where the jurors made no request to use the transcript during their deliberations).

CROSS-EXAMINATION

The defendant contends the trial court's decision to bar him from asking Dr. Stipes certain questions on cross-examination denied him his constitutional right to confront witnesses and present a defense.  U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, §8.

A criminal defendant's right to confrontation under the sixth amendment includes the right to cross examine witnesses against him.  
People v. Kliner
, 185 Ill. 2d 81, 130, 705 N.E.2d 850 (1998).  "Any permissible matter which affects the witness's credibility may be developed on cross-examination."  
Kliner
, 185 Ill. 2d at 130.  However, "[a] defendant's rights under the confrontation clause are not absolute.  Rather, 'the Confrontation Clause guarantees an 
opportunity
 for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' "  (Emphasis in original.)  
People v. Jones
, 156 Ill. 2d 225, 243-44, 620 N.E.2d 325 (1993), quoting 
Delaware v. Fensterer
, 474 U.S. 15, 20, 106 S. Ct. 292, 294, 88 L. Ed. 2d 15, 19 (1985).  

The latitude allowed on cross-examination is within the sound discretion of the trial court.  We will not interfere unless there was a clear abuse of discretion resulting in manifest prejudice to the defendant.  
People v. Frieberg
, 147 Ill. 2d 326, 357, 589 N.E.2d 508 (1992); 
People v. Sandoval
, 135 Ill. 2d 159, 194, 552 N.E.2d 726 (1990). 

The defendant contends the trial court did not allow him to ask Dr. Stipes if he knew the defendant was on psychotropic drugs at the time of trial.  In addition, he contends the trial court did not allow him to ask Dr. Stipes if Mount Sinai had initially told him the defendant was not a patient there.

The State responds that although the trial court partially restricted the defendant's cross-examination of Dr. Stipes in those two limited respects, the defendant's cross-examination of Dr. Stipes satisfied the confrontation clause.  We agree. 

"It is well established * * * that a trial judge has wide latitude to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, or interrogation that is repetitive or of little relevance."  
People v. Fierer
, 260 Ill. App. 3d 136, 148, 631 N.E.2d 1214 (1994).  The proposed line of questioning must relate to a "proper," or material, subject matter, and the evidence that the defendant seeks to elicit must not be "remote or uncertain," i.e., the evidence must be probative of whether "the witness has something to gain or lose by his testimony."  
People v. Furby
, 228 Ill. App. 3d 1, 5, 591 N.E.2d 533 (1992).

Here, the trial court determined the fact that the defendant was taking medication at the time of trial was irrelevant to whether defendant was legally insane on May 6, 1995, when he committed the crimes.  In addition, the court determined Mount Sinai Hospital's initial denial that the defendant was a patient there was irrelevant to the issue of defendant's sanity; the meaning of Mount Sinai's response was speculation.  

Our review of the record shows the defendant was allowed many opportunities to confront, cross examine, and test the truth of Dr. Stipes' testimony.  As such, the trial court's limitations on the defendant's cross-examination of Dr. Stipes failed to create a substantial danger of prejudice to him. 

The trial court's rulings were not an abuse of discretion.  See 
People v. Averhart
, 311 Ill. App. 3d 492, 497, 724 N.E.2d 154 (1999) ("If the entire record shows that the jury has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because defendant has been prohibited on cross-examination from pursuing other areas of inquiry."). 

UNREASONABLE BELIEF

The defendant contends there was sufficient evidence presented to support an instruction to the jury on second degree murder based on an unreasonable belief in self-defense.  We disagree.

Second degree murder occurs when a person commits first degree murder and a mitigating factor is present.  720 ILCS 5/9-2 (West 1994); 
People v. Porter
, 168 Ill. 2d 201, 213, 659 N.E.2d 915 (1995).

The second degree murder statute recognizes two mitigating factors.  See 720 ILCS 5/9-2(a)(1),(a)(2) (West 1994).  Here, the defendant asserts the self-defense category:

"At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under * * * Article 7 of this Code, but his belief is unreasonable."  720 ILCS 9-2(a)(2) (West 1994).

The defendant "bears the burden to prove, by a preponderance of the evidence, one of the factors in mitigation which must be present to reduce an offense of first degree murder to second degree murder."  
People v. Jeffries
, 164 Ill. 2d 104, 114, 646 N.E.2d 587 (1995).

Article 7 states: 

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force.  However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself * * *."  720 ILCS 5/7-1 (West 1994).

If there is evidence in a murder prosecution which if believed by a jury would mitigate the crime to second degree murder, an instruction defining that offense should be given.  
People v. Lockett
, 82 Ill. 2d 546, 551, 413 N.E.2d 378 (1980) (Because there was some evidence the defendant subjectively believed his use of force was justified, a voluntary manslaughter instruction should have been given to the jury which would allow it to convict the defendant of the lesser offense if the jury finds he had such a subjective belief but the belief was unreasonable.).

Our review of the record shows the defendant was not entitled to a second degree murder instruction based on self-defense because expert testimony did not establish the defendant actually perceived Eric West and his family as an imminent physical threat.  
People v. Yates
, 195 Ill. App. 3d 66, 69-70, 551 N.E.2d 999 (1990), supports our conclusion.

In 
Yates
, evidence showed the defendant suffered from post-traumatic stress disorder.  As a result, he reacted to his victim's blackmail attempt as seriously as most people would to an imminent physical threat.  We found that an important distinction.  
Yates
, 195 Ill. App. 3d at 69-70.

Specifically, we held the second degree murder statute provides a mitigating factor only where the defendant actually believes, though unreasonably, that he is physically threatened.  It does not cover, however, "circumstances where a mental disorder causes the defendant to overreact to a non-physical threat."  
Yates
, 195 Ill. App. 3d at 70.  

Those circumstances are present here.  The defendant says he "started the fire believing it necessary to defend himself against a wide-ranging conspiracy out to kill him, and to protect himself from being robbed and his apartment from being burglarized."  The defendant's mental disorder caused him to overreact.

There is no evidence of mitigation in this case that justifies the giving of the instruction.  The evidence adduced at trial was that defendant had a long-standing mental illness, not a mitigating factor under the statute.  Accord 
People v. Aliwoli
, 238 Ill. App. 3d 602, 620, 606 N.E.2d 347 (1992) ("An unproved insanity defense was not intended to be a mitigating factor in the crime of second degree murder."), citing 
People v. Pecina
, 132 Ill. App. 3d 948, 954, 477 N.E.2d 811 (1985) (the court rejected defendant's instruction on voluntary manslaughter even though there was evidence that tended to support the defenses of insanity and voluntary intoxication.) 

The conduct of the defendant in planning and organizing the crime, then fleeing afterwards, negates the notion of self-defense.  We find no abuse of discretion by the trial court rejecting the tendered instruction.

NON-IPI INSTRUCTIONS

The defendant contends it was error for the trial court to reject his tendered instructions that stated the consequences of a not guilty by reason of insanity verdict.  We disagree.

Generally, a trial court is not required to give a jury an instruction which relates the consequences of a not guilty by reason of insanity verdict.  
Aliwoli
, 238 Ill. App. 3d at 618, citing 
People v. Glenn
, 233 Ill. App. 3d 666, 599 N.E.2d 1220 (1992) (observing no Illinois case has reversed a conviction for failure to instruct as to consequences).  

In 
Aliwoli
, we considered the applicability of a "special circumstances exception" requiring an instruction regarding the consequences of a verdict of not guilty by reason of insanity.  Specifically, we noted that in both 
People v. Hebein
, 111 Ill. App. 3d 830, 444 N.E.2d 782 (1982), and 
People v. Alerte
, 120 Ill. App. 3d 962, 458 N.E.2d 1106 (1983), we recognized special circumstances exist where the prosecutor's remarks imply the defendant will be set free if he is found insane.  
Aliwoli
, 238 Ill. App. 3d at 618, citing 
Hebein
, 111 Ill. App. 3d at 838-39; and 
Alerte
, 120 Ill. App. 3d at 972-73.

In 
Hebein
, the court determined the special circumstances exception was not applicable since there was no direct comment on the consequences of a verdict of not guilty by reason of insanity.  The court noted the failure to give the instruction even where special circumstances exist would be harmless error absent a showing there is a reasonable possibility the error might have contributed to the jury's finding.  
Hebein
, 111 Ill. App. 3d at 839-40.  Here, we find no special circumstances, and the defendant points to none, that warrant defendant's consequences instruction.

CLOSING ARGUMENT

The defendant's final contention: he should have been allowed to open and close final arguments at trial because he had the burden of proof on the issue of his sanity. 

Our Supreme Court has rejected defendant's contention: 

"When the defense of insanity is presented during a trial, the Criminal Code specifically places on the State the burden of proving every element of the underlying offense beyond a reasonable doubt, and states that the jury may not consider the issue of defendant's sanity unless and until it first finds that the State has proven the defendant guilty of the offense beyond a reasonable doubt.  [Citation omitted.]

Furthermore, Supreme Court Rule 233 provides that '[t]he parties shall proceed at all stages of the trial, including * * * opening and closing statements * * *, in the order in which they appear in the pleadings unless otherwise agreed by all parties or ordered by the court.'  (107 Ill. 2d R. 233.)  Pursuant to Rule 233, the State had the right to proceed first during closing arguments unless otherwise agreed or ordered by the court.  [Citation omitted.]"  
People v. Odle
, 128 Ill. 2d 111, 133, 538 N.E.2d 428 (1989).

Whether to grant the defendant a rebuttal argument on the insanity issue was in the sound discretion of the trial court.  
Odle
, 128 Ill. 2d at 133.  Because the defendant points to no error of law or actual prejudice resulting from the trial court's decision, we hold the trial court did not abuse its discretion in denying the defendant's request for a rebuttal argument. 

CONCLUSION

We affirm the rulings of the trial court.  

Affirmed.

HALL, P.J., and CERDA, J., concur.