2020 IL App (2d) 180447-U
No. 2-18-0447
Order filed November 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-937 |
| BRANDEN NAPOLITAN, | ) ) | Honorable Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial counsel was not ineffective for advancing only an insanity defense and not a second-degree murder theory.  Affirmed.

¶ 2    After a stipulated bench trial, defendant, Branden Napolitan, was found guilty, but mentally ill, of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2016)) and possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2016)).  The trial court sentenced defendant to concurrent prison terms of 28 years for the first-degree murder conviction and 4 years for the stolen-motor-vehicle conviction.  On appeal, defendant challenges the effectiveness of his trial counsel, arguing

that counsel should not have advanced an insanity defense on defendant's behalf. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant suffers from schizophrenia. Prior to the events at issue, he underwent four psychiatric hospital admissions, including for auditory hallucinations (wherein he heard the voices of men, women, and God), and paranoia (wherein he believed people were trying to harm him). Defendant did not routinely take his prescription medications, because he did not like the way that they made him feel. Defendant admitted to using cocaine.

¶ 5     On October 23, 2015, defendant did not feel well; his mind was racing, and he felt overwhelmed with thoughts. He called 911 and told the operator that he needed assistance getting to a hospital. Paramedics transported defendant to the hospital, and they noted that he had body odor, appeared unkempt, and made comments suggesting that his girlfriend was going to hurt him. After arriving at the hospital, he panicked and ran away; staff apprehended him and brought him back for an evaluation. The hospital's crisis team and emergency-room physician determined that defendant was stable, and he was sent home.

¶ 6     Back at his apartment, defendant's roommate, Daryl Fox, cooked dinner, while defendant smoked cigarettes. Defendant still felt "jittery," but was beginning to feel better. However, at some point during the evening, defendant and Fox argued. Defendant reported that it might have been an argument about doing dishes, or about Fox wanting defendant to eat dinner, when defendant did not want to eat. Defendant reported that he grabbed a knife and thought, "if I do stab him, then everything's going to be ok for me. Like, I'm not going to die," but that "of course" he did not have the nerve to do it right away and that he did not do it until, suddenly, "it just happened." Defendant also reported, however, that, during the argument with Fox, he started

- 2 -

hearing voices, telling him that Fox wished to fatally harm him and that he needed to harm Fox before Fox could hurt him. Defendant grabbed a knife and, as Fox stood smoking a cigarette at a porch door with his back turned, stabbed Fox from behind. Fox turned around and asked defendant why he stabbed him, and defendant responded that he did not know. In one statement, defendant said that, at first, he did not even know that he had stabbed Fox, but that he thought Fox was going to kill him. Defendant stated that his mind went "blank" after stabbing Fox. However, he took Fox's wallet, money, the knife he had used to stab Fox, his cell phone, Fox's cell phone, a telephone charger, a change of clothes, and Fox's car keys and then he left home in Fox's car. We note that defendant also strangled Fox, but it appears that he did not report his thoughts or feelings while doing so.

¶ 7 The next day, defendant called his girlfriend, Danielle Arizaga-Linaras, and told her that he got into a fight with Fox and punched Fox in the nose, but that Fox was okay. Arizaga-Linaras asked defendant why he was driving Fox's car, and defendant became angry and said that he was running from the police after he crashed Fox's car in Richmond, Illinois. As Arizaga-Linaras asked him questions, defendant gave only vague and evasive responses and grew increasingly paranoid. Eventually, defendant said that he was going to his sister's house in Delavan, Wisconsin. Defendant's sister does not, however, live in Delavan.

¶ 8 Ultimately, as attempts by various persons to reach both defendant and Fox were unfruitful, officer William Lintner of the Woodstock police department was asked to perform a wellness check at Fox's residence. The blinds on the back patio door were closed, precluding a view inside, but the front door turned out to be unlocked. Upon entering and searching the house, he found Fox's body lying face down on the floor, with the top half of his body in a closet. Later, the

coroner determined that Fox died from strangulation, but that the stab wound to his back that punctured one of his lungs was a significant contributing factor.

¶ 9   Meanwhile, police in Madison, Wisconsin, began receiving reports about a disoriented man spending time in and around a Metro Mart. When they arrived to check on his welfare, defendant told police that he was waiting for his mother to give him a ride and that he needed no assistance. He appeared disheveled, confused, and was wandering around outside in the cold. Later that evening, police learned that defendant was wanted for homicide. When they returned to the Metro Mart, defendant ran, and, after a police pursuit, defendant was arrested. Officers located Fox's vehicle; the front bumper was ripped off and located in the vehicle's back seat. When interviewed, defendant talked about "Adam and Eve," reported that he felt possessed, and stated that he had argued with Fox before punching him, stabbing him in the back, and then choking him. Defendant stated that he believed that he belonged in an insane asylum. He admitted that, before the incident with Fox, he had not taken his prescription medication and had ingested cocaine. He also told the police that they could have sex with his girlfriend and that he wanted to smoke marijuana with them.

¶ 10   Defendant was transported to Illinois and charged with first-degree murder. Assistant public defender Angelo Mourelatos was appointed to represent defendant, and Mourelatos moved that defendant receive a psychiatric evaluation concerning his mental state at the time of the offense.

¶ 11   Dr. Robert Meyer evaluated defendant on February 1, 3, 5, and 10, 2016, for approximately one hour each meeting. Meyer reviewed the police reports, medical records, etcetera, and he issued a report on February 19, 2016. Meyer noted that, when police interviewed defendant in Woodstock, "Throughout the interview, it was apparent that [defendant] was responding to internal

stimuli in that, on multiple occasions, he appeared distracted as if he was listening to something or someone who was not present in the interview room. He also exhibited sudden mood swings, from being relatively calm to emotionally distressed, and crying spells. At times, he was disconnected from the content of the conversation, unable to follow the topic at hand and missing jokes from the detectives." Meyer determined that defendant was exhibiting signs of psychosis during the police interview. Defendant explained to Meyer that he had been feeling "bad" during the two weeks leading up to Fox's death. Despite taking his medication, defendant heard "very demanding" voices in his head and felt "very paranoid," believing that people were trying to harm him. On the day of the incident, defendant was still hearing voices and feeling paranoid when he got into a fight with Fox. The voices in his head told him that Fox was wanted to kill him, which made defendant feel angry and threatened. During this time, the voices also continuously told defendant to stab Fox, and he recalled "a specific voice saying a mutual friend of ours, Adam, would do it to save his life, so you should do it too." Defendant stabbed Fox. When he did it, the voices told him it would be a "very bad thing" if he did not do it, but he realized that he did something wrong as he drove away.

¶ 12     In his report, Meyer recited the statutory definition of legal insanity (720 ILCS 5/6-2 (West 2016)). He summarized,

> "*** [T]he examiner believes *[defendant] understood his alleged offense was illegal and not condoned by society*, but his subjective understanding of right and wrong was informed by the symptoms of his mental disease—persecutory delusions and auditory hallucinations, which ultimately led him to believe his actions were legally or morally justified. [Defendant] described his motivations as a means of self-defense. [Defendant] carried out the alleged offense with the belief his actions were justified in order to defend

and protect himself from imminent death or great bodily harm. According to the provisions of 720 ILCS 5/6-2 regarding issues of insanity and criminal responsibility, *[defendant] is consistent with an individual who lacked the substantial capacity to appreciate the criminality of his alleged conduct as a result of his mental disease or defect*, in that, the delusional symptoms of his psychotic disorder impaired his contact with reality and led him to believe he would be killed if he did not use the necessary force to prevent imminent death or significant bodily harm." (Emphases added.)

In his report's conclusion, Meyer determined *both* that defendant was "able to appreciate the objective moral or legal standard of the wrongfulness of his alleged conduct while believing his alleged conduct to also be justified based upon his subjective moral judgment" *and* that defendant was not guilty by reason of insanity, because his "mental status at the time of the alleged offense is consistent with his (delusional) belief that his actions were legally and morally justified as an act of self-defense or self-preservation."

¶ 13    On November 5 and 6, 2016, for approximately one hour each meeting, the State's expert witness, Dr. Terrance Lichtenwald, examined defendant. Lichtenwald also reviewed police reports, medical records, etcetera, and he concluded that defendant attempted to elude police and cover up the murder, noting, in part, that he engaged in "goal-directed evasive verbal responses" when various people asked him questions prior to his arrest, fled to Madison, and did not turn himself into police when approached there. Lichtenwald agreed with Meyer that defendant suffered from schizophrenia at the time of the offense, and he determined that defendant had the capacity to appreciate the criminality of this conduct at the time of the offense. Lichtenwald concluded that, because defendant took substantial steps to avoid detection of the crime, he met the criteria for being guilty, but mentally ill.

¶ 14    The stipulated bench trial commenced on January 25, 2018.  Both doctors testified consistent with their reports.  In pertinent part, Meyer testified that defendant was a paranoid schizophrenic and had acted under a mistaken belief that he was protecting himself based on his paranoid delusions.  He noted that, when he interviewed defendant, defendant was medicated and his personality was very "flat" and disconnected, which was very different from how defendant presented in his post-arrest interview with police.  Meyer believed that before, during, and after the offense, defendant was psychotic, very confused, and suffered from auditory hallucinations.  Thus, although defendant believed that killing was wrong, he mistakenly believed that he was protecting himself.  Specifically, although there was no actual threat, in defendant's paranoid mind, there was a threatening situation that required him to act to protect himself.  Further, Meyer testified that defendant's cocaine and alcohol consumption likely exacerbated the schizophrenic symptoms.  Meyer testified that defendant was not guilty by reason of insanity, because, at the time of the offense, his delusional beliefs caused him to feel improperly justified in taking Fox's life.  Meyer disagreed with Lichtenwald's report which, he opined, focused too heavily on defendant's actions after the murder, rather than the totality of the circumstances.  For example, although defendant took with him the knife used in the offense, he seemed unaware of its existence and simply left it in the car and did not try to dispose of it.  Moreover, Meyer disagreed with Lichtenwald that cocaine withdrawal would have led to murder; Meyer opined that defendant's actions were driven by delusions and paranoia, and cocaine might have acted only as a further destabilizing agent.  Meyer testified that he believed that defendant "appreciated the criminality of his conduct," but that the nature of his mental illness and delusions caused him to act in periods of delusion and confusion.

¶ 15    Lichtenwald, in contrast, testified that, while he agreed that defendant suffered from schizophrenia and appreciated the criminality of his conduct, defendant was not legally insane at the time of the offense.  Lichtenwald testified that, with respect to sanity and whether a defendant understood the criminality of his or her actions at the time of the offense, he looks for "an individual that is acting on a delusional belief system, regardless of what the consequence is going to be for that behavior.  I want to see if there is any way that they have mitigated possible consequences for their behavior.  The old, kind of, 'would they do that behavior with a policeman at your elbow' test."  In other words, would he or she have acted the same way if law enforcement were present.  Lichtenwald testified to what he assessed as significant steps and goal-oriented behavior that defendant took after the crime to elude and deceive law enforcement or others.  He explained that defendant told him varying versions of his altercation with Fox, in one version stating that he had to build up courage to attack Fox and, in another, stating that he heard voices telling him to kill Fox.  Lichtenwald testified that persons with schizophrenia can act with aggression, but they are more likely, generally, to be a victim than a perpetrator.  He concluded that defendant was guilty, but mentally ill, as he could appreciate the criminality of his conduct.

¶ 16    On March 9, 2018, counsel provided closing arguments to the court.  In doing so, the State noted that even Meyer had testified that defendant was able to appreciate the criminality of his conduct, which meant that, in fact, Meyer found defendant legally sane at the time he committed the offense.   In addition, the State noted that Meyer rendered his opinion despite some missing data (the results from one test he administered to defendant) and, further, that he basically ignored the steps that defendant took after the crime to hide his conduct or evade apprehension and, thus, that his opinion should not be given great weight. The State pointed out that Meyer "opines that the defendant did appreciate the criminality of his conduct, but then says that the defendant's

mental status at the time of the offense satisfies the legal criteria for not guilty by reason of insanity. That doesn't make sense. It appears that Dr. Meyer's attempting to craft his own little exception to the insanity statute and, frankly, with all due respect, that's not his job ***."

¶ 17 Defense counsel noted defendant's history of hospitalizations and schizophrenic symptoms, including a trip to the hospital with auditory hallucinations the same day as the incident, and argued that Meyer's findings were supported and credible. In addition, he noted that, although Meyer testified that defendant appreciated the criminality of his conduct, he also "found, to a reasonable degree of psychological certainty, that [defendant's] mental status at the time of the offense is consistent with his delusional beliefs that his actions and—were morally justified as an act of self-defense or self-preservation and, therefore, Dr. Meyer's expert opinion satisfies the legal criteria for not guilty by reason of insanity." Further, counsel noted that, according to Meyer:

> "in his mind [defendant] believed that there was an actual threat based on his mental illness, *even though no threat existed*, but based on his mental illness, acted based on voices telling him that the victim in this case, a Mr. Fox in this case who he knew, who was a friend of his, there is no other logical explanation for him to do this act other than voices were telling him to do this. And this pattern of voices telling him to do things and homicidal/suicidal ideations and that God was speaking to him, this individual Adam was speaking to him, come and do this, stem back from all the way from 2007." (Emphasis added.)

Counsel further noted that defendant would remain responsible for the tragedy, even if the court found him not guilty by reason of insanity. Specifically:

> "In addition, Your Honor, if the Court finds that [defendant] is not guilty by reason of insanity, — as the Court is well aware, this does not mean that [defendant] is going to

be released—[defendant] is going to be in custody in the Illinois Department of Human Services and the Court is well aware, pursuant to *People v. Thiem*, [82 Ill. App. 3d 956 (1980)] that it's a maximum sentence. He is going to be getting the help that he needs. He going to be held accountable for his offense and he's going to be in an institution that is going to help him."

¶ 18 In rebuttal, the State commented that, if the court considered Meyer's report, "[h]e says the defendant is so overcome with delusions that he thought that he had to kill or be killed. That's mistaken self-defense. *That's second[-]degree murder, Judge*. That's not, not guilty by reason of insanity ***." (Emphasis added.) The State, later in the argument, however, noted that "the cause of death was strangulation and the victim was stabbed in the back and *there is no evidence whatsoever which would lead you to believe that the victim was the aggressor in any way*." (Emphasis added.)

¶ 19 On March 28, 2018, the court found defendant guilty, but mentally ill, of first-degree murder and possession of a stolen motor vehicle. It credited Lichtenwald's report over Meyer's report, but noted that both doctors found that defendant understood that his actions were wrong and, further, that defendant had demonstrated that understanding based upon his behavior after the crime, *i.e.*, leaving the scene, stealing Fox's car, phone, and wallet, lying to family and friends, and fleeing to Wisconsin. The court noted, however, that "it's more probably true than not that the defendant was, in fact, mentally ill at the time he committed the offenses." The court denied defendant's motion for a new trial.

¶ 20 On June 8, 2018, the court sentenced defendant to 28 years' imprisonment for first-degree murder and 4 years' imprisonment for possessing a stolen motor vehicle. The sentencing order

reflects that the court ordered mental-health treatment and recommended that defendant be placed in a mental-health facility. Defendant appeals.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, defendant contends that his trial counsel was ineffective for pursuing an "all-or-nothing" trial strategy centering on the insanity defense and that counsel misapprehended the law. Defendant notes that Meyer's report clearly indicated that defendant understood the criminality of his conduct, but that his mental illness caused him to unreasonably believe that he was acting in self-defense. Defendant argues that trial counsel, therefore, misapprehended the law, where the report supported a second-degree murder defense, *not* the legal definition of insanity. As such, defendant asserts that he was denied the right to effective assistance of counsel, where counsel advanced a defense that was clearly unsupported by the facts and the law. Further, defendant notes that counsel failed to request a verdict on the lesser offense of second-degree murder, nothing reflects that the trial court *sua sponte* considered second-degree murder, and he was, therefore, prejudiced because second-degree murder would have allowed for a lesser sentence than what he received for first-degree murder. Defendant asks that we reverse his conviction and remand for a new trial.

¶ 23    To establish a claim of ineffective assistance of counsel, a criminal defendant must establish deficient performance and prejudice, namely: that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *People v. Bull*, 185 Ill. 2d 179, 203 (1998). Failure to satisfy either prong defeats the claim. *People v. Patterson*, 192

Ill. 2d 93, 107 (2000). Where ineffective-assistance claims were not litigated below, we review them *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 24    To establish deficient performance, a defendant must prove that his counsel's performance was so inadequate that counsel failed to function as the counsel guaranteed by the sixth amendment. *People v. Nunez*, 325 Ill. App. 3d 35, 42 (2001). In other words, a defendant must show that no reasonably-effective attorney, when confronted with the circumstances of the defendant's trial, would have engaged in similar conduct. *People v. Fletcher*, 335 Ill. App. 3d 447, 453 (2002). As he notes in his brief, to establish that his counsel performed deficiently, defendant must overcome the strong presumption that counsel's actions stemmed from sound trial strategy. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). Counsel's strategic choices are virtually unassailable. *Id.*

¶ 25    Defendant agrees that counsel's all-or-nothing insanity defense would ordinarily be valid trial strategy, *unless* that strategy was advanced based on a misapprehension of law. Such is the case here, defendant argues, because the insanity statute provides that "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2016). Therefore, defendant argues, when counsel received Meyer's report, which found that defendant was able to appreciate the "wrongfulness" of his conduct, as well as Lichtenwald's report, which agreed with that determination, he should have realized that the insanity defense was untenable and that second-degree murder would be the applicable defense. Second-degree murder is applicable, in sum, when a person commits first-degree murder but, at the time of the killing, unreasonably believes the circumstances to be such that would justify or exonerate the killing in self-defense. See 720 ILCS 5/9-2(a)(2) (West 2016). Defendant reiterates that, given Meyer's

finding that defendant acted with an unreasonable belief in self-defense caused by psychosis, which clearly did not fit the legal definition of insanity, but would have fit a second-degree murder theory, counsel's misapprehension of law and all-or-nothing approach constituted deficient performance, not sound legal strategy. For the following reasons, we disagree.

¶ 26    Again, defense counsel's choice of trial strategy, including to argue a particular defense theory, is virtually unassailable. See, *e.g.*, *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 43; *People v. Milton*, 354 Ill. App. 3d 283, 290 (2004). It is true that, although courts have routinely recognized that pursuit of an "all-or-nothing" defense is a valid trial strategy (see *People v. Barnard*, 104 Ill. 2d 218, 231-32 (1984)), such an approach is unreasonable if it is advanced due to counsel's misapprehension of law (*People v. Walton*, 378 Ill. App. 3d 580, 589 (2007)). We do not agree, however, that the record reflects that counsel here misapprehended the law.

¶ 27    From the outset, defense counsel sought to ascertain his client's state of mind at the time of the offense. The report issued by Meyer appeared contradictory in terms of its findings of legal insanity. In the report, he found *both* that defendant appreciated the criminality of his conduct *and* that defendant was legally insane when he committed the offense. Meyer explained that, when the crime was considered in the context of defendant's *entire* psychological history, it is clear that the crime was committed while defendant was experiencing intermittent periods of psychosis and hallucinations. Meyer explained that he believed Lichtenwald's findings were flawed, because they placed too great an emphasis on events *after* the crime, as opposed to the entire psychological profile. The facts of the case demonstrated that defendant had a history of psychiatric hospitalizations, including on the day of the murder, when he called 911 to report hallucinations and racing thoughts, that he did not feel well, and, at that time, he presented with body odor and was unkempt. After the murder, when eventually apprehended in Madison, he appeared

disoriented and confused and was lingering in the cold outside of a store. Given this context, and the totality of information and findings in Meyer's report, counsel could have reasonably determined that pursuing a defense that defendant's schizophrenia precluded him from substantially appreciating the conduct of his crime was reasonable.

¶ 28    Further, the facts here did *not* demonstrate that Fox was actually an aggressor or in any way provoked defendant's behavior. As such, we disagree with defendant's suggestion that counsel was ineffective for not pursuing a second-degree murder theory on the basis that defendant used unreasonable force in his own self-defense. Again, there was nothing to demonstrate that Fox was using, or imminently about to use, unlawful force. See 720 ILCS 5/7-1(a) (West 2016) (a person is justified in the use of force against another when and to the extent that he or she reasonably believes that such conduct is necessary to defend himself or herself against another's imminent use of unlawful force). To argue self-defense, generally, the defendant bears the burden of establishing some evidence of six factors, including that: (1) force was threatened against the defendant; (2) the defendant was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) the defendant actually and subjectively believed a danger existed that required the use of the force applied; and (6) the defendant's beliefs were objectively reasonable. *People v. Washington*, 2012 IL 110283, ¶ 35. As to the sixth factor, if the belief as to the use of force was reasonable, self-defense is applicable and the defendant may be acquitted; however, if the belief as to the use of force was unreasonable, a second-degree murder conviction may be appropriate. See *People v. Hooker*, 249 Ill. App. 3d 394, 403 (1993). Either way, however, there needs to be evidence that defendant actually believed that he was *physically threatened*. "The second[-]degree murder statute provides a mitigating factor only where the defendant actually believes, though unreasonably, that he [or she] is physically threatened. *It does not cover*

*circumstances where a mental disorder causes the defendant to overreact to a non-physical threat*." (Emphasis added.) *People v. Yates*, 195 Ill. App. 3d 66, 70 (1990).

¶ 29     Here, defense counsel (and the State) noted for the court that there was no evidence of an actual threat against defendant.  Defendant nevertheless argues that *Yates* is distinguishable because, there, the defendant suffered from posttraumatic stress disorder and no expert established that the defendant perceived the victim's blackmail attempt as a physical threat, whereas, here, both experts agreed that defendant's schizophrenia could have caused him to genuinely and subjectively believe that Fox imminently intended to kill him.  Defendant also cites in support *People v. McDonald*, 329 Ill. App. 3d 938, 951 (2002), asserting that, there, the court held that the schizophrenic defendant was not entitled to a second-degree murder instruction, where there was no expert testimony establishing he actually perceived the victims as an imminent physical threat, when he set fire to an apartment and killed four people.  Defendant contends that, here, the evidence here would have supported the following application of facts to the above five factors needed to establish second-degree murder: (1) Fox and defendant had an argument; (2) Fox started the argument; (3) defendant believed that Fox imminently intended to kill him based on defendant's illness-induced delusions; (4) Fox's perceived imminent action (homicide) would have been unlawful if true; and (5) defendant subjectively, but unreasonably, believed that his use of force was necessary to defend himself.  Defendant summarizes that, where the trial court found that he was more likely than not mentally ill when he committed the offense, it would have been "more than possible" that the court would also have found him guilty of second-degree murder and, therefore, it was incumbent upon counsel to at least argue in favor of a second-degree murder verdict.  We disagree.

¶ 30    Again, there was no evidence that Fox was in any way an actual physical aggressor or that defendant perceived an actual physical threat from Fox, as opposed to a theoretical threat of harm. Our review of defendant's various statements of the events reflects, overall, his expression of a delusional belief that, *unless defendant acted first*, Fox might harm him. We have not seen any evidence or testimony wherein defendant describes any physical action taken by Fox against him; rather, in sum, defendant expressed that, when he stabbed Fox, Fox stood at a door, smoking a cigarette, with his back turned. Defendant expressed, at one point, that he had to build up nerve to stab Fox, which belies an imminent attack by which he had to defend himself, and that he had experienced delusions for *days* that people were trying to harm him. Indeed, defense counsel noted that defendant heard voices telling him that he needed to act to protect himself, "even though no threat existed," suggesting that counsel *knew* it would be challenging to establish, for a claim of self-defense or second-degree murder, that there was an actual threat of force and that defendant was not the aggressor.

¶ 31    We disagree with defendant that *People v. Lemke*, 349 Ill. App. 3d 391 (2004), warrants a different conclusion. In *Lemke*, the defendant shot his stepson, and, at the bench trial, counsel pursued an all-or-nothing approach, such that the trial court was able to either find defendant guilty of first-degree murder or not guilty because the shooting was an accident, but no involuntary manslaughter theory was pursued. On appeal, the court determined that counsel's strategy could only have resulted from a misapprehension of law, because the evidence presented could not have supported a theory of innocence based on an accident as, by his own testimony, the defendant took a handgun outside as part of an ongoing dispute and had pointed the gun in his stepson's direction. *Lemke*, 349 Ill. App. 3d at 399-400. Under the circumstances, the court concluded that counsel's all-or-nothing approach was not a viable strategy and prejudiced the defendant, and the court

remanded so that the trial court could consider whether the defendant's conduct was not intentional, but was reckless. *Id.* at 401-02.

¶ 32 Here, as mentioned above, the *evidence* presented did not support second-degree murder. Rather, the evidence reflected that, after an argument and without any physical provocation, defendant preemptively stabbed Fox in the back and strangled him because of a delusional perception of risk. Therefore, the evidence reflected only that defendant's mental disorder caused him to overreact to a non-physical threat, which does not constitute second-degree murder. As such, counsel could have made a reasonable strategic decision to pursue only insanity to explain why defendant's actions were taken in response to only a delusional threat of harm. We also find particularly telling counsel's comments in closing argument to the court that finding defendant legally insane would not allow him to evade responsibility for the crime, but it *would* allow him to receive necessary treatment. To us, this suggests that counsel strategically looked at the record as a whole and his client's psychiatric history and determined that, given his inability to prove any actual threat of violence by Fox against defendant, the best result for his client would be to convince the court that insanity applied and that defendant should be institutionalized with treatment, as opposed to incarcerated. Counsel pursued a valid trial strategy and "[t]he mere fact that this strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance." *Walton*, 378 Ill. App. 3d at 589 (citing *People v. Milton*, 354 Ill. App. 3d 283, 290 (2004) ("Counsel's choice [of defense theory] does not constitute ineffective assistance of counsel simply because it was unsuccessful.")).

¶ 33 Moreover, in a bench trial, the court is presumed to know and correctly apply the law, and the presumption is only rebutted where the record affirmatively shows otherwise. *People v. Mandic*, 325 Ill. App. 3d 544, 546 (2001). In addition, the court in a bench trial may *sua sponte*

convict a defendant of second-degree murder. *People v. Walton*, 378 Ill. App. 3d 580, 588 (2007). Thus, despite counsel's strategy, the trial court could have considered the lesser offense; as such, counsel cannot be found ineffective for failing to request that the court do what it was inherently empowered to do even in the absence of a request, *i.e.*, consider second-degree murder. See *People v. Spiller*, 2016 IL App (1st) 133389, ¶ 40 ("counsel cannot be found ineffective for failing to request that the trial court consider second degree murder, as the trial court was empowered to consider this lesser offense regardless of counsel's arguments."). Unlike the courts in *Walton* and *Spiller*, the court here did not expressly consider and reject second-degree murder, but defendant points to no requirement that the court must do so or anything else here to rebut the presumption that the court considered any defense or mitigation properly before it. See *People v. Bardsley*, 2017 IL App (2d) 150209, ¶ 22. Indeed, the State argued to the court that Meyer's report seemed to suggest mistaken self-defense, which would be closer to second-degree murder, and, yet, despite having the lesser offense expressly brought to its attention prior to ruling, the court instead found defendant guilty of first-degree murder.

¶ 34    As defendant has not established that trial counsel's performance was deficient, his ineffective-assistance claim fails, and we need not consider the prejudice-prong of his claim. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). We briefly note, however, that we disagree with defendant's prejudice arguments for some of the same reasons described above. Specifically, defendant argues that the prejudice to him is plain, because first-degree murder carries with it a *minimum* term of imprisonment of 20 years (730 ILCS 5/5-4.5-20(a) (West 2016)), whereas 20 years was the *maximum* term of imprisonment for second-degree murder (730 ILCS 5/5-4.5-30(a) (West 2016)). Instead, he received 28 years' imprisonment, more than the maximum he could have received for second-degree murder. He contends that there was a possibility that the trial

court would have found him guilty of second-degree murder, had counsel advanced the theory, as the court, by finding him guilty but mentally ill, must have found that defendant's schizophrenia impaired his judgment at the time of the offense, did not state that second-degree murder was inapplicable, and sentenced him on the lower-end of the sentencing range for first-degree murder.

¶ 35    Prejudice is established when there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *People v. Cloutier*, 178 Ill. 2d 141, 163 (1997). " 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *People v. Albanese*, 104 Ill. 2d 504, 525 (1984) (quoting *Strickland*, 466 U.S. at 686).  Here, defendant cannot show that, but for counsel's alleged deficient performance, the result would have been different, where the evidence did not support a second-degree murder conviction and where the trial court was inherently empowered to consider *sua sponte* second-degree murder, that crime was brought to its attention in argument prior to ruling, and it, nevertheless, found defendant guilty of first-degree murder.  Defendant argues that there was a reasonable probability that the court could have found him guilty of second-degree murder based on the fact that it found him guilty, but mentally ill, and sentenced him toward the lower end of the applicable sentencing range.  We disagree.  Although the court found that defendant was guilty, but mentally ill, and sentenced defendant on the lower end of the first-degree-murder range, it still did *not* give him the minimum sentence.  The court pointed out that defendant took several steps after the murder to avoid apprehension, which caused it to reject the assertion that defendant was incapable of comprehending the criminality of his conduct. Defendant's ineffective-assistance claim fails.  We affirm.

¶ 36                                III. CONCLUSION

¶ 37   For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 38   Affirmed.