2022 IL App (2d) 210073-U
No. 2-21-0073
Order filed April 29, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16-CM-193 |
| | ) | |
| JOHN F. PIZZO, | ) | Honorable |
| | ) | William P. Brady and |
| | ) | Marcy L. Buick |
| Defendant-Appellant. | ) | Judges, Presiding. |

JUSTICE Jorgensen delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm, concluding (1) the trial court did not err by permitting the State to elicit other-crimes evidence on the issue of defendant's propensity; (2) the court did not violate defendant's right to confront witnesses; (3) the court did not consider the State's erroneous cycle-of-violence argument at trial; (4) the court did not err by denying defendant's motion to disqualify the prosecutor and appoint a special prosecutor; and (5) the State proved defendant's guilt beyond a reasonable doubt.

¶ 2    After a bench trial, the trial court found defendant, John F. Pizzo, guilty of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2016)) and sentenced him to 18 months' conditional discharge. He appeals, contending (1) the trial court erred by admitting, under section 115-7.4 of

the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2016)), evidence of his prior alleged domestic battery of the victim; (2) the court improperly limited his examination of the victim, both at a pretrial hearing and at trial, in violation of his sixth amendment right to confront the witnesses against him; (3) the court erred by denying his motion to disqualify the prosecutor; (4) the court erred by conducting a colloquy with the State on matters not in evidence and considering that discussion in reaching its finding of guilt; and (5) the State failed to prove his guilt beyond a reasonable doubt. We reject each of defendant's contentions and affirm.

¶ 3                                  I. BACKGROUND

¶ 4                    A. Defendant's Relationship with the Victim

¶ 5       In 2009, defendant and the victim, Wen Ding Lee, began an on-and-off dating relationship. In 2012, defendant was charged in Du Page County with domestic battery in relation to an incident that occurred on August 4, 2012, between defendant and Lee. The State apparently nol-prossed the charges, and all records relating to the incident were later expunged.

¶ 6       On October 2, 2015, Lee was charged in De Kalb County with domestic battery as a result of an incident that occurred between her and defendant. The case was docketed as case No. 15-CM-1151 and was set for trial on February 11, 2016. However, defendant, who was the complaining witness in that case, was not subpoenaed and did not appear. Thus, the matter was continued, over Lee's objection, to April 6, 2016. On March 31, 2016, the trial court, at Assistant State's Attorney Alesandra Friend's (ASA Friend) request, dismissed the charges against Lee. The records relating to case No. 15-CM-1151 were later expunged.

¶ 7                                  B. The Charges

¶ 8       On February 26, 2016, the State charged defendant by complaint with two counts of domestic battery, alleging defendant knowingly caused bodily harm (count I) and knowingly made

contact of an insulting nature (count II) to Lee. Specifically, the State alleged that, on February 13, 2016, defendant placed his hands upon Lee's face and his knees upon her chest, causing bruising.

¶ 9                    C. Lee's Petition for Order of Protection

¶ 10    On February 29, 2016, Lee petitioned for an order of protection, and the petition was docketed into the criminal proceedings against defendant. The same day, the trial court (Judge William P. Brady) entered an emergency order of protection against defendant, which was later extended. In her petition, Lee alleged that, around 2 p.m. on February 13, 2016, she arrived at defendant's residence. She previously told defendant that she would arrive around noon. Later that evening, after they ate dinner, they sat in the living room, watching television. Defendant sat on the couch, and Lee sat on the floor in front of the fireplace. Defendant asked her to move to the couch. Lee complied with defendant's request because, the week before, defendant became upset with her when she did not sit close to him. Defendant and Lee faced each other on the couch, and defendant began ridiculing Lee "for [a] barrage of things from the past to current." Lee alleged defendant "requires [her] to be very still, look straight at his eyes, listen carefully[,] and answer him exactly the way he would like answers worded. As [defendant] went thru [*sic*] this list he started to get more and more upset but [Lee] kept quiet as [she] learned from the past couple of months things can turned [*sic*] bad at a flick of a switch without warning."

¶ 11    Lee further alleged defendant was upset with her because she did not surrender her cell phone to him (so he could review its content) immediately upon her arrival at his house and because she arrived about two hours after her estimated arrival time. Lee explained to defendant that she was late because she stopped to purchase roses, a Valentine's Day card, and chocolate. Defendant replied, "I was thinking to myself what if something happened to you[.] I am the first one they will come speak to." Defendant then questioned Lee about where she was and what she

was doing. Lee again explained she stopped to buy him gifts but, according to Lee, "that [explanation] was not good enough." Defendant became increasingly upset, pulled Lee "down toward him on the sofa," and got on top of her. Defendant pinned Lee to the sofa with his legs and began grinding his knees into the left side of her chest and right armpit, causing her pain. He then accused her of "talking to other guys" and began pinching her cheeks "repeatedly with both of his hands very hard." Defendant stated he knew the truth and asked Lee "who [she had] fuck[ed]." Defendant then slapped Lee on the left side of her head. The impact caused Lee to "see stars." Defendant continued to accuse Lee of "talking to other people" and wanted a "confession." Defendant threatened Lee, stating that, if she did not tell him the truth, he would "pinch [her] hard again." Defendant became more enraged, called Lee a "lying cunt," and demanded that Lee repeat that phrase. He threatened Lee again, this time stating that, if she did not tell him the truth, he would "hang [her] from a tree." Lee stayed silent and allowed defendant to pinch her face, because she was afraid "his rage [would] push him over the edge."

¶ 12    Lee asked defendant to use the bathroom, and defendant replied, "bull shit, you can pee right here. I don't care." Lee told defendant she had to "do more than pee," so he allowed her to go to the bathroom. He followed her, telling her nobody was "keeping [her] here." Defendant sat in the mudroom, which is next to his office, against the door that led into the garage. When Lee exited the bathroom, he directed Lee to sit in front of him. Defendant continued to ridicule Lee and "then brought up [his] shooting [of] invasive birds *** thru his office window" and that "he is a good shot." Lee did not believe defendant had a gun in the office but did not want to take a chance. Defendant finally said he was tired and told Lee to go to bed with him. While at the bottom of the stairs, he said to Lee, "you know you are spineless, right? It doesn't matter what I do to you."

¶ 13    Lee also alleged "there were several incidents in the past," including one in 2012, which led to defendant being charged with domestic battery. During that incident, defendant stripped off her clothes in a parking garage, twisted her arms, and then threw her out of a car. Ultimately, the 2012 charges against defendant were "dropped."

¶ 14    On April 1, 2016, the trial court (Judge Philip C. Montgomery) held a hearing on Lee's petition. (The record does not indicate why Judge Montgomery, as opposed to Judge Brady, presided over the hearing.) Lee testified in support of the petition. Her testimony was largely consistent with the allegations of her petition, and defense counsel extensively cross-examined her. Defendant also testified. The court granted Lee's petition.

¶ 15                                    D. Pretrial Proceedings

¶ 16              1. *Litigation Related to the State's Use of Other-Crimes Evidence*

¶ 17    The State gave notice of its intent to introduce, under section 115-7.4 of the Code, other-crimes evidence, specifically, relating to the August 4, 2012, incident. The State indicated defendant had been charged with domestic battery in 2012, but, because all records relating to the charges were expunged, it did not have a copy of the police report. However, the State noted Lee had provided a detailed two-page account of what occurred, which was previously tendered to defendant.

¶ 18    In response, on January 4, 2018, defendant moved to bar the other-crimes evidence. In his motion, defendant maintained that, because the records relating to those charges had been expunged, the State could not "provide any evidence beyond the mere statement of [Lee], which is insufficient to comply with [the] statute and which is more prejudicial than probative as it cannot be cross examined due to non-existence of a police report or arrest."

¶ 19    On March 5, 2018, the trial court held a hearing on defendant's motion. Defendant called Lee, who provided details regarding the August 4, 2012, incident. Specifically, Lee testified that, around noon on August 4, 2012, she and defendant went to a beer festival in Wheaton. They stayed for a couple hours, during which time Lee had five or six beer samples, before going to a nearby bar. They began arguing because defendant wanted Lee to have a drink but Lee did not want to. Defendant was "very disappointed" and called Lee "uncooperative."

¶ 20    Defendant and Lee left the bar and walked to their car, which was parked in a public parking garage. They continued their argument as they walked. Defendant told Lee "he wasn't happy because [she] didn't do what he said and [she] didn't listen." He also told Lee she needed to "learn to be humble, *** and he was going to teach [her] that." Defendant entered the driver's seat, and Lee entered the front passenger seat. Their argument continued, and defendant began poking and pushing Lee. Lee did not react, because she did not want to agitate defendant. Defendant then pulled down on Lee's shorts. Lee resisted, and, in response, defendant smacked Lee. Defendant removed Lee's shorts, underwear, and shirt and threw them onto the driver's side of the windshield, all while Lee begged him not to. Defendant told Lee that, if she wanted her clothes back, she should exit the car and get them. Lee did not want to, because there were people in the garage who would have seen her naked. Lee begged defendant to give back her clothes, and, eventually, he did so.

¶ 21    Lee put back on her shorts and shirt, and they left the garage. As they drove toward Interstate 88, defendant pushed Lee's head against the window and twisted her left arm behind her back, which caused her face to hit the dashboard. Defendant stopped on the entrance ramp. He told Lee, "I've had enough of you, get out ***, I don't want you in the car, *** find your way home."

He got out of the car, walked to the passenger side, pulled Lee out of the car, and threw her on the ground. Defendant drove away.

¶ 22   Lee did not call the police. A nearby police officer arrived almost immediately. Lee was crying, and the officer told Lee to get into the squad car. Lee complied with the officer's request and, while in the squad car, called defendant to ask him to come back to get her. Defendant told Lee, "too *** fucking bad, that is what you get, I am long gone, almost home, deal with it."

¶ 23   The officer took Lee to the police station, where Lee answered questions about what happened. Lee did not tell the police she had injured her head on the dashboard or that defendant took off her clothes. Lee reviewed the police report. Later, she learned defendant had been charged with domestic battery. After defendant was charged, he was "very nice" to Lee, stated he wanted to marry her, and bought her a ring. She did not appear to testify against defendant. According to Lee, defendant's lawyer told defendant to tell Lee she should not testify against him if they were to be married.

¶ 24   Lee testified that, during their relationship, she learned to submit to defendant's wishes. She explained that submission was "the safest way and the calmest way" to avoid "repercussion[s]."

¶ 25   Over the State's relevance objection, defense counsel also questioned Lee about the 2015 incident that led to the charges against her. Lee denied she committed a battery against defendant, even after the police told her there were marks on the side of defendant's face. Instead, Lee testified, defendant hit her. Lee acknowledged she was charged in relation to that incident and, as the case approached trial, she reported the February 13, 2016, incident to the police (but not the State's Attorney's office).

¶ 26    Defense counsel then began questioning Lee regarding the February 2016 incident. The focus of counsel's examination on this point was what Lee did after the assault. Lee testified she did not call the police on February 13 and stayed with defendant until the next day. She did not go to the hospital or tell anyone that defendant struck her. She drove defendant's vehicle home, and two of the tires blew out on her way. She was not traveling fast when it happened. Lee denied her chest hit the steering wheel and that she was bruised as a result of the accident. Defense counsel then asked Lee if she had taken photographs of her injuries before the accident, and the court interjected, "Could I ask a question, counsel? We're here on a motion *in limine* to prevent [Lee] from testifying about an event that occurred in August of 2012." Counsel responded, "I'll go on, Judge. I understand." The court told defendant the hearing was not a discovery deposition regarding the 2016 incident, and, again, counsel stated, "I understand."

¶ 27    After Lee's testimony concluded, the court noted the issue was complicated because the charges against defendant were dismissed and the related records were expunged. Thus, the court explained, there was no access "to what other people may have seen, whether there was any bruising to corroborate the statements of Ms. Lee, to corroborate any of the statements that she has made, which is—creates problems for both sides." The court also noted that Lee had provided considerably more detail in her testimony than she did in her petition for order of protection, which, in regard to the August 2012 incident, stated only that defendant had stripped off Lee's clothes, twisted her arm, and then threw her out of the car. The court further explained that defendant could not impeach Lee's testimony, because he did not have access to any records that may have existed.

¶ 28    In response to the court's comments, the State argued that section 115-7.4 does not require an arrest or conviction, and, therefore, it contemplates the use of unreported incidents. The State argued the incidents were factually similar because they both involved defendant punishing Lee

by inflicting physical harm when she did not act the way defendant wanted her to. According to the State, this case involved "an ongoing relationship of [defendant] having dominance over [Lee] and [Lee] learning to act a certain way and be submissive in how she goes about her behavior within their relationship."

¶ 29　Defendant told the court he would prefer to prepare a written memorandum in support of his position. Accordingly, the court ordered defendant to file his memorandum by April 16, 2018, ordered the State to file a response by June 30, 2018, and set the matter for a ruling on July 27, 2018.

¶ 30　The court and the parties also discussed the fact that the court *sua sponte* limited defense counsel's inquiry into the February 13, 2016, incident. The State noted Lee had provided a detailed account of the incident in her petition for order of protection and during her lengthy testimony at the hearing on the petition. The State offered a copy of the transcript from that hearing into evidence, and the court admitted it without objection, stating it would consider the transcript in making its decision. The court acknowledged it should not have limited defense counsel's inquiry, but, regardless, it had a sufficient record—Lee's petition, the transcript from the hearing on the petition, and Lee's testimony—to determine whether there was sufficient factual similarity between the two incidents.

¶ 31　The court also asked ASA Friend whether the fact the charges against Lee were dropped was going to be an issue at trial. ASA Friend stated she anticipated it would be. The court asked ASA Friend who was responsible for the decision to drop the charges, and ASA Friend stated she made that decision. ASA Friend maintained Lee knew the case was dismissed but did not know why the case was dismissed. ASA Friend then stated "somebody else [could] try the case and ask [her] why [she] decided to dismiss the charges." The court told defense counsel to decide whether

he would call ASA Friend. Defense counsel said he would confer with defendant and make a decision.

¶ 32    On July 27, 2018, the court continued the matter to August 24, 2018. The record does not contain a report of those proceedings. On August 14, 2018, defendant filed his memorandum in support of his motion to bar the other-crimes evidence.[1] Defendant argued the other-crimes evidence was "highly prejudicial with little to no probative value." Specifically, he noted it had been more than six years since the August 2012 incident took place. He asserted the two incidents lacked sufficient factual similarity, noting the August 2012 incident "involve[d] alleged stripping of clothes, a slamming of the head, twisting of the arm, and throwing out of the car," while the February 2016 incident "involve[d] a knee to the chest, pinning [Lee] down, and an alleged punch." He also asserted the "other relevant facts and circumstances" supported a finding that the prejudicial effect of the evidence outweighed its probative value. On that point, defendant highlighted the fact that any records relating to the August 2012 incident had been expunged and that the State had provided "no medical evidence, no physical evidence, no police reports, nor independent witness testimony that th[e] incident ever took place, despite the fact that [it] took place during the day in a public place." He also asserted the court should consider the August 2015 charges against Lee and their subsequent expungement, arguing the timing of the charges against him in February 2016 was suspicious and diminished the probative value of the other-crimes evidence.

---

[1] The State did not file a response, later explaining it did not do so because defendant's memorandum was filed just days before the hearing.

¶ 33    Defendant also argued that, in the event the court found evidence relating to the August 2012 incident was admissible, the court should permit him to inquire into the August 2015 charges against Lee. He asserted this was an appropriate area of inquiry because it would establish Lee's interest, bias, and motive to testify falsely against defendant.

¶ 34    At the August 24, 2018, hearing, defendant offered more argument in support of his position. Specifically, he contended the later expungement of the records relating to that incident should bar its use because an expungement "goes all the way back to the beginning of the case[;] it's voided. The definition of expungement is to void it, to obliterate it, to destroy it," so that "[i]t can't be used for any purpose whatsoever."

¶ 35    The court denied defendant's motion to bar the other-crimes evidence, finding the absence of a conviction and the later expungement did not, as a matter of law, bar admission of the evidence. The court also granted defendant's request to allow his inquiry into the 2015 charges against Lee.

¶ 36        3. *Defendant's Motions to Disqualify ASA Friend and to Dismiss*

¶ 37    On the day the trial was set to begin, on April 25, 2019, defendant moved to disqualify ASA Friend and to dismiss the complaint. In his motion to disqualify, defendant stated he intended to call ASA Friend as a witness, because she "inserted herself as a potential witness into this case," when she made the decision to dismiss the 2015 charges against Lee. Further, defendant alleged ASA Friend apparently had access to the 2012 case records and reviewed them despite the fact they had been expunged. (ASA Friend told the court she never had access to those records.) He contended ASA Friend should not have reviewed the expunged records and her consideration of them prejudiced her against her complaining witness (defendant), "thereby creating a conflict [of interest] as she was already representing the interests of [the State's] complaining witness,

[defendant]." Defendant asked the court to disqualify ASA Friend, appoint a new prosecutor, and "have the case proceed to trial today."

¶ 38    In his motion to dismiss, defendant further fleshed out his claim that ASA Friend had a disqualifying conflict of interest. In that regard, defendant asserted the State had a duty "to continue to prosecute [the] case through trial against [Lee], and at very least, ask the Court to appoint a Special Prosecutor to investigate the allegations made by [Lee] against [defendant]." Further, he contended, "[t]he mere fact that *** [defendant] was a complaining witness, turned Defendant, is an obvious conflict of interest."

¶ 39    During the hearing on the motion, defendant contended that, when Lee accused defendant, who was the State's complaining witness in the case against Lee, of battering her, either the court or a special prosecutor should have decided which charge would proceed.

¶ 40    The court denied both motions. It noted the State had prosecutorial discretion to determine which charges it would pursue. It also noted defendant never stated his intent to call ASA Friend as a witness and waited until the day of trial to file his motions, despite the fact he knew of their basis well before he filed them.

¶ 41                                E. Bench Trial

¶ 42    The State's theory of the case was that defendant exerted dominance and control over Lee during their relationship and, when she did not act according to his preferences, he physically abused her, which manifested twice, once in August 2012 and again in February 2016. Defendant's theory was that Lee fabricated the February 2016 assault so that she could escape prosecution for the charges she faced in relation to the 2015 incident. The evidence at trial showed as follows.

¶ 43                                1. *The State's case*

¶ 44                                a. Lee

¶ 45    At trial, Lee testified that, in 2009, she and defendant began an on-and-off dating relationship. During their relationship, defendant "required" Lee to be still and look directly at him whenever he talked to her. When defendant asked Lee questions, she "need[ed] to word [her] answers the way he deemed proper."

¶ 46    On August 4, 2012, defendant and Lee went to a beer festival in Wheaton, where Lee drank some beer samples. After they left the festival, an incident occurred in the parking garage where they had parked. According to Lee, she had not done what defendant wanted her to do. Defendant told her that she was not humble, did not listen, and thought she was "better than other people." As they sat in the car, defendant pulled off Lee's shorts, underwear, and shirt and threw them on the outside of the windshield. Lee "tried to block" defendant, but he pushed her head. Defendant told Lee, who was now wearing just her bra, "that was to teach *** [her] to be humble," and, if she wanted her clothes, she would have to get out of the car to retrieve them.

¶ 47    Defendant and Lee drove out of the garage and headed toward defendant's house. Defendant continued to push Lee's head. He then began twisting Lee's arm behind her back, which caused her head to hit the dashboard. Lee resisted defendant, which made him angry. Defendant told Lee, "I'm sick and tired of you," and then stopped his car on an entrance ramp. He exited the car, walked to the passenger side, and said, "get out. You're getting out now." Defendant opened the passenger door, pulled Lee out, and threw her on the ground. Defendant got back into the car and drove away. In March 2013, defendant and Lee stopped dating, but they later got back together.

¶ 48    On February 13, 2016, Lee and defendant agreed to meet at defendant's house. Lee was supposed to be there "around 12-ish," but arrived at 2 p.m. Defendant greeted her at the door and asked her why she was late. She told defendant she was late because she stopped to get him roses, chocolate, and a card for Valentine's Day.

¶ 49      Defendant was painting the interior of his house, and Lee helped him with some tasks that he had assigned to her. They cooked and ate dinner together. After dinner, they sat in the living room. Lee sat on the floor in front of the fireplace, and defendant sat on the couch. Defendant was not happy that Lee "was sitting too far from him," a complaint he had also made a week before. Defendant told Lee to sit on the couch and directed Lee to put her legs toward him. Thus, Lee and defendant sat on opposite sides of the couch, facing each other with their feet in the middle of the couch.

¶ 50      Defendant again asked why she was late and where she had been. Lee again told him she was late because she had stopped to buy him gifts. Defendant was not happy with Lee's answer. He pulled Lee's legs toward him, causing Lee to lie flat on her back. He got on top of Lee and placed one knee on the upper left side of her chest and his other knee in her "elbow and *** side area." Defendant ground his knee into Lee's chest, which caused Lee pain. Defendant also grabbed Lee's face with both hands, dug his fingers in, and pinched and pulled Lee's face. As defendant did so, he told Lee he did not believe her explanation of why she was late. Instead, he accused Lee of texting, messaging, and sleeping with other people and told Lee he wanted to "know the truth." When Lee did not confess to defendant's accusations, he slapped the left side of her head. Lee temporarily lost her vision; she "saw nothing but the brightest white light." Defendant asked Lee if she knew what "cold-cocked" meant and then said it meant "[s]omeone slapping you really hard unexpectedly." Defendant also called Lee "a lying cunt," told her to repeat that phrase until he said to stop, and told her that he would hang her from a tree if she did not tell him the truth.

¶ 51      Defendant was on top of Lee for "quite a while, *** at least an hour, an hour and a half." She told him she had to use the bathroom, and he said, "no, just pee on yourself." Lee told defendant she had to do "more than just peeing," and defendant said, "you can go shit on yourself."

¶ 52 Eventually, however, defendant got off Lee and followed her to the bathroom door. When Lee exited the bathroom, defendant was sitting by the door in the mudroom that led into the garage. Defendant told Lee to sit down and told her that he was "a very good shot." Lee knew defendant had "many guns" at the house, and, because defendant had told her he would hang her from a tree, she was worried he was going to kill her. After some time, defendant said he was tired and wanted to go to bed. They both got up, and, as they walked upstairs, defendant told Lee she was spineless.

¶ 53 Once upstairs, defendant picked up Lee and threw her on the bed. Defendant again got on top of Lee, held her down, and used his hand or thumb to forcefully press on the left side of her chest, where his knee had been.

¶ 54 The next morning, defendant seemed calmer. He said he needed supplies to make dinner, and Lee volunteered to go to the store, so that she could be out of the house. Defendant said, "no, jump in the shower, we'll do that together." After their shower, they went to the store and came back to make dinner. As they ate, defendant ridiculed Lee.

¶ 55 Lee left defendant's house that night, driving defendant's truck. She did not call the police after she left. Over the next several days, Lee took photographs of her injuries. In total, six photographs were admitted into evidence. We have reviewed the photographs. They appear to be screenshots of photographs taken on a mobile phone and are stamped with a date and time. Three of the photographs, dated February 15, depict light-colored bruises on both sides of Lee's face, near her jawline, adjacent to her ears. Another photograph, dated February 17, depicts two distinct bruises on the left side of Lee's chest. The last two photographs do not state a precise date but, rather, state they were taken on "Monday." (The State later represented to the court that the two photographs were taken on February 15, 2016, which we note was a Monday.) One of the

photographs shows the bruises on Lee's chest, and the other shows the bruise on the right side of her face.

¶ 56    On February 16, 2016, Lee had a headache, felt very nauseated, and could not "really stand up that well." Believing she may have a concussion, she called her primary care physician's office and spoke to a nurse, who told Lee to go to the emergency room. Lee went to the emergency room, where she was examined. She told hospital staff what happened but asked them not to report it to the police.

¶ 57    On February 17, 2016, Lee hosted an event presented by a social club to which she and defendant belonged. On cross-examination, defense counsel showed Lee a photograph that was purportedly taken during the event, which was admitted into evidence as defense exhibit No. 5. The photograph depicts two women, one of whom was Lee. It does not depict any visible bruising on Lee's face. Lee did not know the other woman in the photograph or if the photograph was taken during the event. Lee confirmed she did not observe any bruises on her face in the photograph but explained she was wearing makeup.

¶ 58    Lee continued to have contact with defendant after the incident. The next weekend, defendant invited Lee to a business dinner. Lee denied that, during the dinner, defendant told her that he no longer wanted to be in a relationship with her.

¶ 59    On February 25, 2016, Lee reported the incident to the police. She had not previously told anyone about the assault (other than the emergency room personnel).

¶ 60    On cross-examination, Lee acknowledged that, on February 13, 2016, she was a defendant in a criminal case in which she was accused of battering defendant. A previous condition of her bond in that case was that she was not to have contact with defendant. But, by February 2016, the court had modified the conditions, at defendant's request, to allow them to have contact. She saw

defendant many times between October 2015 and February 2016. She also acknowledged that, just two days before the incident in question, the trial in her criminal case was continued, over her objection, to April 6, 2016, because defendant did not appear to testify against her. Lee denied that she and defendant discussed the pending case against her and that, at any point, she saw a subpoena defendant had received to testify against her. She discussed her case with her lawyer but denied that she fabricated the February 2016 incident so that defendant would be arrested and unable to testify against her. She explained, "My lawyer knows what to do. I just follow what he says, yeah. He knows what to do. He's a good lawyer, very good."

¶ 61   Lee also testified that, as she was driving home on February 14, 2016, around 10 p.m., a tire blew out on defendant's truck while she was on the exit ramp to Route 59. At the time, Lee was wearing her seatbelt. Lee denied she had a collision, and, because the vehicle was drivable, she drove it home. Lee told defendant the tire blew out, but she denied telling defendant she was waiting for assistance from the American Automobile Association (AAA). According to Lee, she was not an AAA member.

¶ 62   Defense counsel asked Lee about her educational background, and Lee testified she had a bachelor's degree in physical chemistry and that she attended classes at Rutgers University. Defense counsel then asked Lee whether she obtained her degree from Rutgers, and the State objected. Defense counsel responded that the question went to Lee's credibility, because she had apparently represented to others that she obtained her degree from Rutgers. The court stated whether she obtained her degree from Rutgers was of little relevance to his credibility determination and directed counsel to "move on."

¶ 63                         b. Police Officers

¶ 64    Around 2:30 p.m. on February 25, 2016, Sergeant Ben Hiatt met with Lee at the sheriff's department. He observed "some slight bruising," which was "starting to clear up," on Lee's cheeks and lower jaw. Lee showed him several photographs that she had taken of her injuries, which were admitted into evidence. Three of those photographs, which were taken on February 15, 2016, showed slight discoloration on both sides of Lee's face.

¶ 65    Detectives Lindie Baumann and Jackie Hill also met with Lee. Baumann observed and took photographs of "some light bruises on [Lee's] cheeks" and "some yellow-ish bruises on her upper chest." Hill also observed bruises on Lee's face, which she described as "aging bruising."

¶ 66                              c. Dr. Peter Schubel

¶ 67    Dr. Peter Schubel testified that, on February 16, 2016, he examined Lee in the emergency room at Edward Hospital in Naperville. He observed bruising on the left side of Lee's chest and noted it in her chart. He did not observe any obvious signs of trauma, bruising, or scrapes on Lee's face or head. Had he observed any bruising or scrapes on Lee's face, he would have noted it in her chart. However, he made no such notation. Dr. Schubel also testified it was possible, in the event of a car accident, that a seatbelt could cause bruising on a person's chest, but such bruises generally "follow the line of the seatbelt."

¶ 68                              2. *Defendant's Case*

¶ 69                              a. Affidavit of Sheila Jones

¶ 70    Defendant introduced an affidavit from Sheila Jones, who was the manager of emergency road services for the Auto Club Group (a subsidiary of AAA). Jones averred that Lee was a member of AAA on February 13, 2016, through February 16, 2016. She reviewed the call records for Lee and determined that Lee made two service calls in February 2016. In regard to the first call, made at 9:40 p.m. on February 14, 2016, Jones averred, "The breakdown location was 2139

City Gate Lane, Naperville, Illinois[,] on a 2014 White Honda Ridgeline with a tire issue. The towing facility was T & A Towing West. The tow destination was [Lee's residence]." In regard to the second call, made at 11:58 a.m. on February 15, 2016, Jones averred, "The breakdown location was [Lee's residence] on a 2014 White Honda Ridgeline with a tire issue. The towing facility was T & A Towing West. The tow destination was Discount Tire 535 Fort Hill Dr[ive] Naperville, Illinois." The court admitted the affidavit and records to impeach Lee's testimony that she had not used AAA and was not involved in an accident.

¶ 71                                      b. Sandra Baskin

¶ 72     Sandra Baskin did not know defendant or Lee. On February 17, 2016, she went to a social event, where she was photographed with another woman. According to Baskin, the photograph, defense exhibit No. 5, accurately depicted how she and the other woman appeared on that date.

¶ 73                    3. *Closing Arguments and the Trial Court's Findings*

¶ 74     During its closing argument, the State argued, in pertinent part, that defendant had "a controlling, ongoing abusive relationship" with Lee. The State pointed to Lee's testimony that, throughout their relationship, defendant required that Lee behave a certain way and asserted that Lee had "learned and become conditioned to this complacent and submissive behavior to the defendant." The State maintained the events of February 13, 2016, were "the culmination of th[e] abusive relationship" they had. On that point, defendant responded that Lee voluntarily saw defendant the week after the February 13, 2016, incident, which was not typical of a victim of domestic battery. Defendant asserted Lee had "manipulated the system by creating a submissiveness that simply d[id] not exist" and used that to turn herself from a defendant into a victim. In rebuttal, the State asserted "this case [was] all about the cycle of violence when you look at the continuous duration of the relationship between the defendant and Ms. Lee." Defendant did

not object to this statement. The court interjected and questioned the State about its argument regarding the "cycle of violence." It quoted at length from this court's disposition in *People v. Signorile*, 2016 IL App (2d) 140086-U, and noted its awareness that "cycle of violence" is a clinical term that requires expert testimony to support. Defendant did not object to the colloquy. The court permitted defendant to have the last word, and counsel commented on Lee's credibility, asserting "there [was] at least enough incredibility in the testimony she gave to cast doubt on everything that was said, and for that reason, I just don't think—I don't think there's enough. I really don't." The court replied, "And nor should you, okay?"

¶ 75    The court found defendant guilty of both counts of domestic battery, stating as follows:

"I have in front of me evidence of multiple incidents of domestic violence, and at the trial that evidence has been contradicted by allegations of bias because [Lee] was charged with a criminal offense. It has been contradicted by evidence that she acted in a fashion not consistent with a person who is the victim of an offense, she testified in a manner that was as to an issue impeached, and it's contradicted *** by evidence that there are signs of bruising on February 15th that were not observed on February [16th.]

***

*** That *** are not observable on the photograph on February 17th. And yet I also have evidence, as I said, of prior incidents of domestic violence as well as evidence in this case of domestic violence.

And for the record, the Court observed a level of credibility to [Lee's] testimony while she was on the stand, so that's the confluence that I have in trying to make a decision, a lot of things coming back and forth, and some people might say well, if it's that difficult, then it has to be—it can't be beyond a reasonable doubt.

I guess at the end of the day, the incident in [2012.]

***

It has striking similarities to this incident, and the evidence in 2012 has not been contradicted and can be used for propensity.

If [section 115-7.4 of the Code] didn't exist, if that testimony regarding the 2012 incident was not admissible, there would be a different decision in this case. But it is, and [section 115-7.4] says what it says, and I cannot hide from the reality if that's what they want the Court to rely on, that's what I'm directed to rely on, that I can just ignore it."

¶ 76    After a brief recess to discuss scheduling, defense counsel stated he and defendant were shocked by the court's decision, explaining the court, in its colloquy, made comments that were favorable to the defense and implied there was reasonable doubt of defendant's guilt. He also contended it seemed as if the court had considered the State's cycle-of-violence argument. The court responded as follows:

"I didn't consider [the cycle-of-violence argument], but I did consider the statutory provision for the propensity, and at the end of the day what I was trying to say, if perhaps a bit inartfully, the statute that allows me or directs me to consider prior incidents, in this case prior incidents that were not contradicted on the issue of propensity, along with my observation that I found the witness credible even with some of the impeaching characteristics of her testimony, was sufficient in my mind to prove it beyond a reasonable doubt.

Trust me. When I say a case is difficult to decide, I mean a case is difficult to decide. I went the way that I felt the law directed me to go. The only thing that based—you know,

it would have been easy to go the other way, but I don't believe that that's what the law was directing me to do."

After defense counsel interjected that section 115-7.4 did not *require* the court to find a defendant guilty when other crimes evidence is admitted, the court continued as follows:

"No, it does—it certainly does not say that, nor did I—do I mean to infer that that's what I did, but it is something that the Court can take into consideration, and under these facts as I indicated, there were some similarities, sufficient similarities that allowed me to note them and use that particular statute.

Counsel, you know, trust me. *** I know that—that you disagree and with good reason. It's just that when I'm sitting here, I've got to make the call one way or the other, and I felt that in this particular case the evidence was sufficient, and therefore, I am directed to enter the finding of guilty."

¶ 77 Defendant then orally moved for a mistrial, based on the court's colloquy with the State regarding the "cycle of violence." After the court pointed out that it read a passage from *Signorile* and told the State they could not rely on that theory, defendant responded, "once the toothpaste is out of the tube, you can't get it back in." The court denied the motion.

¶ 78 F. Sentencing

¶ 79 Because of Judge Brady's impending retirement, the parties agreed to hold the sentencing hearing instanter. The court sentenced defendant to an 18-month term of conditional discharge.

¶ 80 G. Defendant's Posttrial Motion

¶ 81 On July 8, 2019, defendant moved for a new trial, which he later supplemented with a memorandum of law. The trial court (Judge Marcy L. Buick) denied the motion, and this appeal followed.

¶ 82                                    II. ANALYSIS

¶ 83    On appeal, defendant contends (1) the court erred by denying his motion to bar the other-crimes evidence; (2) the court violated his sixth amendment confrontation rights when it limited his examinations of Lee at trial and in the hearing on his motion to bar the other-crimes evidence; (3) the court erred when it denied his motion to disqualify ASA Friend and refused his request to appoint a special prosecutor; (4) the court erred when it discussed with the State the purported "cycle of violence" in this case, where that theory was not supported by expert testimony, and then considered that evidence in finding defendant guilty; and (5) the State failed to prove his guilt beyond a reasonable doubt.

¶ 84                              A. Other-Crimes Evidence

¶ 85    Defendant first contends the trial court erred by denying his motion to bar the State from presenting, under section 115-7.4 of the Code, evidence of the August 2012 incident. Specifically, defendant assails the court's ruling on four bases.[2] First, citing *People v. Ward*, 2011 IL 108690, defendant argues the trial court "erred in not considering the *nolle prosequi* [of the 2012 charges] in reaching [i]ts [d]ecision" on the motion. Second, citing *People v. Jenk*, 2016 IL App (1st) 143177, defendant asserts the court erred when it admitted the evidence, as a matter of law, because there existed no evidence to corroborate Lee's account of the incident. Third, he argues that, because the records relating to the 2012 incident had been expunged, "it [was] error to admit it."

_____

[2] Defendant also presents a fifth basis: he asserts the trial court erred in admitting the evidence because it "was not able to properly compare the 2012 incident to the 2016 incident *** because the [C]ourt did not allow defense counsel to address the facts of the 2016 incident at the hearing [on his motion to bar the evidence]." We address that argument in section II-B.

Fourth, he asserts the trial court abused its discretion when it denied his motion to bar the other-crimes evidence. We turn first to the general principles governing the admission of other-crimes evidence in domestic-violence cases.

¶ 86       1. *Other-Crimes Evidence and Section 115-7.4 of the Code*

¶ 87       Other-crimes evidence is evidence that the defendant has committed misconduct or criminal acts that occurred either before or after the criminal conduct for which the defendant is standing trial. *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). Generally, though it may be used for other purposes, other-crimes evidence is inadmissible when it is relevant only to demonstrate a defendant's propensity to engage in criminal activity. *Id.*

¶ 88       The legislature has carved out an exception to this general rule in domestic-violence cases. Under section 115-7.4 of the Code, when, as here, a defendant is accused of an offense involving domestic violence, evidence of his or her "commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant," including propensity, provided its probative value is not substantially outweighed by the risk of undue prejudice. 725 ILCS 5/115-7.4(a) (West 2016); *People v. Dabbs*, 239 Ill. 2d 277, 291 (2010). When balancing the probative value of and risk of undue prejudice from such evidence, the court may consider (1) the proximity in time to the charged offense, (2) the degree of factual similarity to the charged offense, or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.4(b) (West 2016).

¶ 89       Whether to admit other-crimes evidence is a matter for the trial court's discretion. *Dabbs*, 239 Ill. 2d at 284. Thus, the court's decision will not be disturbed absent an abuse of discretion. *Id.* However, to the extent defendant contends the court erred as a matter of law in admitting the evidence, our review is *de novo. People v. Caballero*, 206 Ill. 2d 65, 87-88 (2002).

¶ 90        2. *The Trial Court's Purported Failure to Consider the Charges*

*Relating to the 2012 Incident Were Nol-Prossed.*

¶ 91    Citing *Ward*, 2011 IL 108690, defendant first argues the trial court erred by failing to consider the fact the State nol-prossed the 2012 charges against him when it determined the other-crimes evidence was admissible. He asserts a *nolle prosequi* is "tantamount to an acquittal," and, therefore, the court should have considered it.

¶ 92    Defendant's reliance on *Ward* is misplaced. In *Ward*, our supreme court held the trial court abused its discretion when, *during trial*, after it permitted the State to introduce of the defendant's prior sexual assault of a different victim to prove his propensity, it precluded defendant from eliciting evidence of his acquittal in the case arising out of that prior assault. *Id.* ¶ 48. Thus, *Ward* did not address the question presented by defendant here: whether, in its pretrial determination that the other-crimes evidence was admissible, the court should have considered evidence that the State nol-prossed the 2012 charges against him.

¶ 93    Moreover, we disagree with defendant's assertion that a disposition of *nolle prosequi* is tantamount to an acquittal. A *nolle prosequi* is a legal notice that the State has abandoned its prosecution of a particular defendant or charge, and an acquittal is a certification, made by the trier of fact, that an accused person is not guilty of the charged offense. Black's Law Dictionary 30, 1259 (11th ed. 2019); see also 14A Ill. L. and Prac. *Criminal Law* § 196 (a *nolle prosequi* is not the same as an acquittal).

¶ 94    That aside, the record is devoid of any support for defendant's contention that the trial court failed to consider the State's abandonment of the 2012 charges against defendant. Indeed, the record shows the contrary. After Lee's testimony at the hearing on defendant's motion, the court expressly recognized that its determination was complicated by the fact the charges had been

dismissed, thus demonstrating it considered that fact in denying defendant's motion to bar the other-crimes evidence. Accordingly, we reject defendant's claim that the court failed to consider the *nolle prosequi* of the 2012 charges.

¶ 95                                   3. *Lack of Corroboration*

¶ 96    Citing *Jenk*, 2016 IL App (1st) 143177, defendant next argues the trial court erred, as a matter of law, in admitting the other-crimes evidence where there was no evidence to corroborate Lee's account of what transpired.[3] Defendant notes the State failed to offer any independent corroborating evidence of the 2012 incident, such as medical evidence, physical evidence, or independent witness testimony, and maintains, therefore, the admission of the other-crimes evidence risked undue prejudice to defendant.

¶ 97    We disagree with defendant's assertion that, to be admissible under section 115-7.4, other-crimes evidence must, as a matter of law, be independently corroborated. The statute contains no such requirement, and defendant fails to cite any authority, other than *Jenk*, to support his position. But *Jenk* says no such thing.

¶ 98    *Jenk* did not consider whether section 115-7.4 of the Code requires that other-crimes evidence be supported by corroborating evidence. Rather, the *Jenk* court considered whether the trial court, under the facts of that case, abused its discretion in permitting the State to elicit evidence of three prior acts of domestic violence committed by the defendant. *Id.* ¶¶ 35-41. To be sure, in its analysis of the issue, the court summarized the trial court's ruling, noting the trial court had

---

[3] Defendant's brief erroneously cites to *People v. Donoho*, 204 Ill. 2d 159 (2003). The text of his brief makes it clear that he intended to cite to *Jenk* for the proposition that the trial court, as a matter of law, cannot admit uncorroborated other-crimes evidence.

barred the State from introducing evidence of three prior incidents of domestic violence because the State failed to present any corroborating evidence, while allowing evidence of three incidents that were corroborated. *Id.* ¶ 38. However, the *Jenk* court did not hold or even consider whether the trial court's reason for barring that evidence was correct.

¶ 99    That said, we have no quarrel with the notion that whether the other-crimes evidence is independently corroborated is a proper consideration for the trial court when engaging in the balancing test required under section 115-7.4. Indeed, a lack of corroborating evidence could, in any given case, decrease the probative value of the other-crimes evidence, increase its risk of undue prejudice, or both. However, section 115-7.4 does not *require* the other-crimes evidence to be independently corroborated.

¶ 100                     4. *The Effect of Expungement on Admissibility*

¶ 101   Defendant next argues the trial court erred by denying his motion, as a matter of law, because the records relating to the 2012 incident had been expunged. According to defendant, the 2012 incident "was expunged" and, therefore, "did not comport with the statutory requirements to admit such evidence." It is not clear to which statute defendant is referring. He cites to section 5.2 of the Criminal Identification Act (20 ILCS 2630/5.2 (West 2020)). But the question presented here is whether evidence of another incident of domestic violence can be admitted under section 115-7.4 of the Code when any records relating to that incident have been expunged.

¶ 102   We conclude the expungement of the records relating to the 2012 incident did not, as a matter of law, bar the State from using the other-crimes evidence under section 115-7.4. Essentially, defendant argues the absence of any official record of the offense occurring bars its use under section 115-7.4. But section 115-7.4 contains no express prohibition on the use of evidence relating to the commission of another offense when records relating to that offense either

do not exist or have been expunged. See 725 ILCS 5/115-7.4 (West 2016). Indeed, section 115-7.4(c) provides that the State "must disclose the evidence, including statements of witnesses *or a summary of the substance of any testimony*, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice for good cause shown." (Emphasis added.) *Id.* § 115-7.4(c). (The record shows the State tendered to defendant a two-page summary of Lee's anticipated testimony regarding the 2012 incident.) By permitting the State to provide merely a summary of the substance of the testimony, the legislature has demonstrated its intent to allow evidence of other-crimes even when there are no police or other official records relating to the offense.

¶ 103 Further, we reject defendant's assertion that the 2012 incident "was expunged" and, therefore, "the incident and any reference to it should have been deemed inadmissible." Contrary to defendant's assertion, the expungement did not "erase[,] *** destroy[,]" or "declare *** null and outside the record" all evidence of the incident. See Black's Law Dictionary 727 (11th ed. 2019) (defining "expunge"). The effect of the expungement was to remove from the public record *all records* relating to the charges. 20 ILCS 2630/5.2 (West 2020) (" 'Expunge' means to physically destroy *the records* or return them to the petitioner and to obliterate the petitioner's name from any official index or public record, or both." (Emphasis added.)). But the expungement did not destroy Lee's memory of the events or her ability to testify about them.

¶ 104                    5. *The Trial Court did not Abuse Its Discretion*

¶ 105 Finally, defendant asserts the court erred when it admitted the other-crimes evidence because the risk of undue prejudice outweighed the probative value of the evidence. He asserts the lack of corroborating evidence and the expungement of the records relating to the 2012 incident rendered Lee's testimony unduly prejudicial. He also argues the two incidents "lacked any factual similarity." We disagree.

¶ 106   As noted, under section 115-7.4, the trial court must balance the probative value of and risk of undue prejudice from the other-crimes evidence and, in doing so, may consider (1) the proximity in time to the charged offense, (2) the degree of factual similarity to the charged offense, or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.4(b) (West 2016).

¶ 107   We conclude the trial court did not abuse its discretion in admitting the evidence under section 115-7.4. As to temporal proximity, the supreme court has explained that there is no bright-line rule and that each case must be evaluated under its own facts. *Donoho*, 204 Ill. 2d at 183-84. In *Donoho*, the supreme court found the passage of 12 to 15 years since the prior offense, while lessening its probative value, was insufficient on its own to bar admission of the evidence. *Id.* at 184. Here, the other-crimes evidence occurred less than four years before the charged offense. Additionally, we note Lee and defendant were in an on-and-off relationship during this time period. We find, under these circumstances, the 2012 incident was sufficiently proximate in time to the current offense.

¶ 108   As to the factual similarity between the offenses, defendant has forfeited his argument that the two incidents lacked sufficient factual similarity by failing to adequately develop an argument and cite pertinent authority to support it. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides that a party must present argument in support of all points raised. "Both argument and citation to relevant authority are required. An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule." *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010). Thus, a party forfeits a point when he or she fails to present a well-developed and well-reasoned argument to support it. *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009).

¶ 109   The entirety of defendant's argument on this point states, "Beyond both incidents being reports of alleged domestic violence, the 2012 and 2016 incidents lack any factual similarity." This does not constitute argument under Rule 341(h)(7). It is wholly undeveloped, and defendant offers no citation to pertinent authority. Accordingly, we conclude defendant has forfeited this point.

¶ 110   Forfeiture aside, we note that, because no two crimes are exactly alike, section 115-7.4 requires only that the other-crimes evidence bear a "general similarity" to the charged offense. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 43. "[T]he 'existence of some differences' between a charged offense and other-crimes evidence does not defeat the admissibility of the other-crimes evidence." *People v. Ross*, 2018 IL App (2d) 161079, ¶ 173 (quoting *Donoho*, 204 Ill. 2d at 185. Of course, the greater the degree of similarity, the greater the probative value. *People v. Lobdell*, 2017 IL App (3d) 150074, ¶ 23 (citing *Donoho*, 204 Ill. 2d at 184).

¶ 111   Here, the 2012 and 2016 incidents shared sufficient factual similarity. Admittedly, the two offenses were committed in different places and involved different physical acts. However, other facts showed the offenses were highly similar, which increased the probative value of the evidence. First, both offenses involved the same victim. See *Ross*, 2018 IL App (2d) 161079, ¶ 173 (in discussing the probative value of the other-crimes evidence, noting the charged offense and other-crimes evidence involved the same victim). Second, both incidents contained a common theme: defendant (1) confronted Lee about her behavior that he did not like; (2) verbally disparaged Lee; (3) became angry; (4) committed acts of domination and control; and (5) manifested his anger by physically attacking Lee.

¶ 112   As to the other relevant facts and circumstances, defendant asserts the lack of independent corroborating evidence and the expungement of the records relating to the 2012 incident increased the risk of undue prejudice. We do not disagree that the lack of independent corroboration and the

expungement of the records may have increased the risk of undue prejudice. But, in light of the temporal proximity of the two incidents and their factual similarity, we cannot say the trial court's determination that the risk of undue prejudice did not *substantially* outweigh the probative value was unreasonable. See *Donoho*, 204 Ill. 2d at 182 (an abuse of discretion occurs when the trial court's decision is unreasonable). Accordingly, we conclude the trial court did not abuse its discretion by denying defendant's motion to bar the other-crimes evidence.

¶ 113                                  B. Confrontation Clause

¶ 114  Defendant next contends the trial court violated his sixth amendment right to confront the witnesses against him when it limited his examination of Lee, both during trial and during the hearing on his motion to bar the other-crimes evidence. We disagree.

¶ 115                       1. *General Principles and Standard of Review*

¶ 116  The sixth amendment provides, "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him [or her]" (U.S. Const., amend. VI), which includes the right to cross-examine (*People v. McDonald*, 329 Ill. App. 3d 938, 948 (2002)). See also Ill. Const. 1970, art. I, § 8 (Illinois counterpart to the sixth amendment). A defendant may cross-examine a witness on any permissible matter which affects the witness's credibility (*McDonald*, 329 Ill. App. 3d at 948-49), and is entitled to explore a witness's biases, interests, or motives (*People v. Frieberg*, 147 Ill. 2d 326, 357 (1992)). A defendant's confrontation rights, however, are not absolute. *McDonald*, 329 Ill. App. 3d at 949. Rather, the confrontation clause guarantees only the *opportunity* for effective cross-examination. *Id.* at 949. It does not guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish. *Id.* Further, "[i]f the record shows that the [trier of fact] had been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely

- 31 -

because the defendant had been prohibited on cross-examination from pursuing other areas of inquiry." *People v. Herrera*, 257 Ill. App. 3d 602, 615 (1994).

¶ 117    The scope of cross-examination rests within the discretion of the trial court. *People v. Nutall*, 312 Ill. App. 3d 620, 627 (2000). Accordingly, we will not interfere with the trial court's limitation absent an abuse of discretion. *Id.* Further, a defendant may not prevail on a claim that he or she was denied a sufficient opportunity to confront witnesses unless he or she demonstrates the trial court's limitation of his or her examination resulted in prejudice. *Id.* at 627-28.

¶ 118                            2. *Limitation of Cross-Examination at Trial*

¶ 119    Defendant first asserts the trial court improperly limited his cross-examination of Lee at trial. We disagree.

¶ 120    On this point, defendant paints with a broad brush, asserting the court limited his cross-examination into matters which concerned Lee's credibility, bias, and motive, which "was critical to and dispositive in this case, but could not be adequately assessed as defense counsel's cross-examination was improperly restricted." However, defendant cites to only one instance in the record where his cross-examination was limited: the trial court's limitation of his inquiry as to whether Lee obtained a degree from Rutgers University, which bore on Lee's credibility because, purportedly, she represented to others that she obtained her degree from Rutgers but may not actually have done so. Essentially, defendant was attempting to establish Lee's trial testimony was untruthful because she had lied on some prior occasion.  This is not proper under Illinois law, and the trial court was correct to limit the inquiry on the matter. *People v. Santos,* 211 Ill. 2d 395, 403-05 (2004). But even if the inquiry was proper, the record shows defense counsel fully and extensively cross-examined Lee—indeed, the court overruled each of the State's other

objections—and was permitted to fully explore other impeaching aspects of Lee's testimony. See *Herrera*, 257 Ill. App. 3d at 615.

¶ 121                           3. *Limitation of Examination at Pretrial Hearing*

¶ 122   Defendant also asserts the trial court violated his confrontation rights when it limited his inquiry into the 2016 incident at the hearing on his motion to bar the other-crimes evidence. He notes the purpose of that hearing, in part, was to provide the court the opportunity to compare the factual similarity between the 2012 and 2016 incidents. He maintains the court's limitation of his examination deprived the court of necessary evidence to properly compare the two incidents, which "directly impacted the Court's ruling ***, resulting in the improper admission of the 2012 incident into evidence." Further, he asserts, the court recognized its error after the fact, when, referring to its limitation of counsel's examination, it stated, "that was my bad." We are not persuaded.

¶ 123   Initially, defendant's argument assumes the confrontation clause applied, and both parties address this issue as if the confrontation clause applies. We are not so sure.

¶ 124   Defendant's argument on this point erroneously refers to his cross-examination of Lee at the hearing on his motion to bar the other-crimes evidence. Defendant's examination of Lee at the hearing was not cross-examination; rather, defendant called Lee as a witness in support of his motion. Thus, defense counsel conducted a direct examination of her at the hearing, and Lee was not a "witness against him" as that term is used in the confrontation clause. U.S. Const., Amend. VI. Moreover, the ability to cross-examine prior to trial is not crucially significant if a defendant has the opportunity to cross-examine at trial, and as long as the defendant is given the opportunity at trial, like defendant was here, his or her confrontation rights are not violated. See *People v. Stewart*, 303 Ill. App. 3d 844, 849-50 (1999), *aff'd as modified*, *People v. Lofton*, 194 Ill. 2d 40

(2000) (holding the defendant's absence from a pretrial hearing under section 115-10 of the Code, which allows the admission of hearsay testimony in certain sex-offense cases, did not violate the defendant's confrontation rights, but ultimately concluding the defendant's absence violated his due-process right to be present at every critical stage of trial).

¶ 125   Even if the confrontation clause applies, defendant cannot show he was prejudiced by the trial court's limitation of his inquiry, because the record shows the court had an adequate record on which to assess the factual similarity of the two incidents. First, we feel compelled to point out that, when the court interjected into counsel's examination of Lee, defense counsel had not asked a single question about the factual circumstances of the 2016 assault. Instead, counsel's inquiry was focused on what actions Lee took after the assault. Thus, it does not necessarily follow that the court's limitation of defense counsel's inquiry deprived it of the factual context needed to evaluate the other-crimes evidence. In other words, it is not clear that defendant ever intended to elicit testimony regarding the factual details of the assault itself.

¶ 126   Moreover, at the hearing on the motion, the trial court took judicial notice of the court file, which contained Lee's verified petition for order of protection in relation to the February 2016. In her petition, Lee provided significant factual detail regarding the assault. In addition, the court admitted the transcript from the April 1, 2016, hearing on Lee's petition and said it would consider that transcript in making its decision. During that hearing, defendant's attorney extensively cross-examined Lee, and, on appeal, defendant has not stated what additional information he wished to but was prevented from eliciting from Lee. Under these circumstances, we fail to see how the court's limitation of his inquiry prejudiced defendant. See *Nutall*, 312 Ill. App. 3d at 627-28. Accordingly, we reject this claim.

¶ 127                    C. The State's Cycle-of-Violence Argument

¶ 128    Defendant next contends the trial court erred in conducting a colloquy with the State about its cycle-of-violence theory of the case. It is not exactly clear what defendant is arguing on this point. Defendant notes the term "cycle of violence" is a clinical term that requires expert testimony be given in support of the theory. Defendant asserts the State "exceeded reasonable parameters in [its] closing when [it] expounded on the 'cycle of violence' during [its] rebuttal," given the State failed to present expert testimony to support its theory. He then asserts that, even if the State's comments alone were not error, those comments "initiated a lengthy colloquy between the [State] and the Court for pages of testimony." Given the length of the discussion, defendant asserts, the court must have considered the State's argument, which was improper absent expert testimony and substantially prejudiced defendant. Thus, it is not clear whether defendant is also asserting a claim of prosecutorial error.

¶ 129    In any event, defendant forfeited this argument by failing to raise a contemporaneous objection during the State's argument and the ensuing colloquy. To properly preserve an issue for review, a party must assert a timely objection and raise the issue in a posttrial motion. *People v. Davis*, 205 Ill. 2d 349, 361 (2002). A timely objection is one that is made contemporaneously with the objectionable conduct. *People v. Watt*, 2013 IL App (2d) 120183, ¶ 46. Admittedly, defendant objected to the State's reference to a "cycle of violence" and the ensuing colloquy and thereafter moved for a mistrial. However, he did not *contemporaneously* object but, rather, raised the issue for the first time *after* the trial court had announced its finding of guilt. Accordingly, defendant has forfeited this claim.

¶ 130    Forfeiture aside, the record flatly rebuts defendant's assertion that the trial court considered the State's reliance on a "cycle of violence" in determining defendant's guilt. First, during the colloquy, the court expressly recognized the State's argument was improper absent expert

testimony to support it and even read an extensive passage from this court's decision in *Signorile*, which, though an unpublished decision, held the State's discussion of a "cycle of violence" without having presented expert testimony on the subject was error. Second, when defendant raised the issue after the court announced its findings, the court expressly stated it did not consider the State's assertion that Lee was the victim of a "cycle of violence." Third, we note there exists a presumption that the court considers only admissible evidence in rendering its decisions. *People v. Naylor*, 229 Ill. 2d 584, 603 (2008).

¶ 131  Defendant nevertheless argues "it flies in the face of reason to believe that the [c]ourt in the case at bar did not consider the 'cycle of violence' after the significant time (over 10 pages of the trial transcript) appropriated to discussing the concept." However, defendant's speculation, which based only on the length of the discussion, is not enough to overcome the trial court's overt statements and the applicable presumption. Accordingly, we reject this claim.

¶ 132            D. Defendant's Motion to Disqualify ASA Friend

¶ 133  Defendant's next contention is that the trial court erred when it denied his motion to disqualify ASA Friend. He maintains the court should have either appointed a special prosecutor or required the State to appoint a different ASA to prosecute the case (1) because ASA Friend had a *per se* conflict of interest based on her decision to dismiss the 2015 charges against Lee; and (2) to avoid an appearance of impropriety that resulted from ASA Friend "prosecuting these two significantly divergent cases where the interests are directly in conflict."

¶ 134  Disqualification is a drastic remedy, and courts must be vigilant in ensuring that motions to disqualify are not misused as tactical weapons for the purpose of harassment or delay. *In re Estate of Wright*, 377 Ill. App. 3d 800, 804 (2007). Thus, a party seeking disqualification of opposing counsel bears the heavy burden of showing an actual conflict of interest. *In re Estate of*

*M.L.*, 2018 IL App (3d) 170712, ¶ 22. Because the remedy of disqualification exists, in part, to protect the courts' vital interests in maintaining public confidence in the legal profession and ensuring the integrity of judicial proceedings, " 'any doubts as to the existence of a conflict should be resolved in favor of disqualification.' " *Wright*, 377 Ill. App. 3d at 804 (quoting *SK Handtool Corp. v. Dresser Industries, Inc.*, 246 Ill. App. 3d 979, 989-90 (1993)). A trial court's decision on a motion to disqualify an attorney will not be disturbed absent an abuse of discretion. *Marshall v. County of Cook*, 2016 IL App (1st) 142864, ¶ 22.

¶ 135   Defendant first argues ASA Friend had a *per se* conflict of interest based on her decision to dismiss the domestic-battery charges against Lee. In support of his argument, defendant invokes Rule 1.7 of the Illinois Rules of Professional Conduct of 2010 (Ill. R. Prof'l Conduct (2010) R. 1.7 (eff. Jan. 1, 2010)). Rule 1.7 provides a lawyer shall not represent a client if he or she has a concurrent conflict of interest. *Id.* A concurrent conflict of interest exists when (1) "the representation of one client will be directly adverse to another client," or (2) "there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client *** or by a personal interest of the lawyer." *Id.*

¶ 136   As defendant concedes, a prosecutor does not represent a complaining witness; rather, he or she is a representative of the people. See *People v. Golz*, 53 Ill. App. 3d 654, 658 (1977). And because ASA Friend did not represent either Lee or defendant, Rule 1.7 is inapposite, as that rule defines concurrent conflicts of interest. Moreover, generally, a prosecutor may have a conflict only when he or she is interested in the cause as a private individual or is an actual party to the litigation. *Marshall*, 2016 IL App (1st) 142864, ¶ 22. Here, ASA Friend had no private interest in the cause and was not an actual party. Because neither Lee nor defendant were ASA Friend's clients, we find she did not have a disqualifying conflict of interest.

¶ 137   Relying on *People v. Lang*, 346 Ill. App. 3d 677 (2004), defendant also argues the trial court should have disqualified ASA Friend and appointed a special prosecutor because her prosecution of the case, if not a conflict of interest, gave rise to an appearance of impropriety. We are not persuaded.

¶ 138   Section 3-9008 of the Counties Code (55 ILCS 5/3-9008 (West 2018)) governs the appointment of a special prosecutor. "The purpose of this provision is to prevent any influence upon the discharge of the duties of the State's Attorney by reason of personal interest." *Lang*, 346 Ill. App. 3d at 681. The trial court has discretion to appoint a special prosecutor at any stage of the case, and we will not disturb that decision absent an abuse of discretion. *Id.*

¶ 139   Section 3-9008 provides the trial court may, on its own motion or that of an interested person in a cause or proceeding, appoint "some competent attorney to prosecute or defend the cause or proceeding" in two situations: when the State's attorney (1) "is "sick, absent, or unable to fulfill his or her duties," and (2) "has an actual conflict of interest in a specific case." 55 ILCS 5/3-9008(a-5), (a-10). In *Lang*, this court held the appointment of a special prosecutor may also be proper in a third situation: when it is "necessary to remove the appearance of impropriety in the prosecution of a defendant." *Lang*, 346 Ill. App. 3d at 682.

¶ 140   However, *Lang* was decided under a prior version of section 3-9008, which permitted a special prosecutor to be appointed when the State's Attorney was "interested in any cause or proceeding." See 55 ILCS 5/3-9008 (West 1998). In 2016, however, the legislature amended section 3-9008, removing the language on which the *Lang* court relied. Pub. Act 99-352, § 20-145 (eff. Jan. 1, 2016) (amending 55 ILCS 5/3-9008); see *In re Appointment of Special Prosecutor*, 2019 IL App (1st) 173173, ¶ 33. Under the current version of section 3-9008, in effect both when this prosecution was commenced and when defendant moved to disqualify ASA Friend, the party

seeking a special prosecutor must demonstrate an actual conflict of interest, not merely the appearance of impropriety. *Id.* ¶¶ 33-39. Thus, even if we were to conclude ASA Friend's prosecution of defendant after having dismissed the case against Lee created an appearance of impropriety (which we do not), that reason was not sufficient to require disqualification of ASA Friend in favor of a different prosecutor.

¶ 141 Moreover, we note defendant moved to disqualify and named ASA Friend as a potential witness on the morning before trial was set to begin, despite the fact he was aware of his basis for doing so—ASA Friend's dismissal of the charges against Lee—more than one year before doing so. Moreover, his motion requested that a new prosecutor be appointed and the matter proceed immediately to trial. In that light, it appears defendant's motion to disqualify was nothing more than an attempt to obtain a tactical advantage over the State.

¶ 142 Given the fact that no actual conflict of interest existed, and the 11th-hour filing of the motion, we find the court did not abuse its discretion in denying defendant's motion to disqualify ASA Friend.

¶ 143                         E. Sufficiency of the Evidence

¶ 144 Finally, defendant challenges the sufficiency of the evidence. Defendant does not dispute that Lee's testimony, if believed by the trial court, was sufficient to sustain the charges. Rather, he maintains the evidence was insufficient because Lee's testimony could not be believed by a rational trier of fact. Specifically, he points to the fact Lee's testimony was impeached and to Lee's apparent motive to fabricate allegations against defendant, in light of her status as a defendant in case No. 15-CM-1151. He also asserts the trial court primarily based its finding of guilt on the other-crimes evidence. We disagree.

¶ 145   When a defendant challenges the sufficiency of the evidence, "a reviewing court must determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted; emphasis in original.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008). We will not retry the defendant, and "the trier of fact remains responsible for making determinations regarding the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *Id.* A criminal conviction will be set aside only when the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 146   Defendant asserts Lee was impeached "multiple times." But he only points to one specific instance in the record: when Lee testified that, on February 14, 2016, she was not an AAA member, did not call AAA for roadside assistance, and was able to drive away from the location where her tires blew out. This testimony, defendant notes, was directly contradicted by Jones's affidavit, which established Lee called AAA to report "tire issues" and that her vehicle was towed to her residence. Further, he argues Lee had a motive to fabricate the allegations against him. On this point, defendant emphasizes the timing of the incident, noting it took place two days after the State obtained a continuance, over Lee's objection, to secure defendant's (its complaining witness) attendance at trial in the matter against her. Thus, defendant contends, given Lee's testimony was impeached and in light of her apparent motive, a rational trier of fact could not have accepted Lee's testimony.

¶ 147   We first note that the impeachment to which defendant points was not on a material fact but, rather, on the ancillary matter of whether Lee was able to drive her vehicle from where her tires blew out. In any event, the trial court was aware of both the impeaching aspects of Lee's

testimony and her apparent motive but nevertheless found Lee's testimony had a "level of credibility" that convinced it that defendant had committed the charged offenses. It is not our function to second-guess the trial court's credibility determination. *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 46; *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 33. Indeed, the trial court was free to accept certain aspects of Lee's testimony while rejecting others. *Rouse*, 2014 IL App (1st) 121462, ¶ 46.

¶ 148   Defendant also argues that Lee's testimony and the State's photographs, which were taken by Lee, were contradicted by Schubel. Schubel, he notes, examined Lee on February 16, 2016, three days after the incident but did not observe any bruising on Lee's cheeks (or at least did not note any in Lee's chart). Thus, he argues Lee's cheeks could not have been bruised as Lee said they were, and he implies (though he does not actually argue) Lee may have fabricated or manipulated the photographs to bolster her allegations against defendant.

¶ 149   Just as it was aware of the impeachment of Lee and her apparent motive, the trial court was aware of the inconsistency between Lee's testimony that defendant bruised her cheeks, which were visible on February 15, 2016, and Schubel's testimony that he did not note those bruises in Lee's chart. The resolution of this inconsistency, however, was uniquely within the province of the trial court. See *Collins*, 106 Ill. 2d at 262. The trial court resolved this inconsistency in favor of the State, and we will not disturb that determination on appeal. *Id.* Further, the trial court was free to reject defendant's implication that Lee fabricated or manipulated the photographs she took of her injuries. *Ross*, 229 Ill. 2d at 272.

¶ 150   Defendant also points out that Schubel testified that a person could be bruised by his or her seatbelt in the event of an accident. He again implies, without expressly arguing, that a rational trier of fact could have found Lee was bruised when her tires blew out. Admittedly, Schubel

testified a person could be bruised by a seatbelt. But he also testified that any such bruise would likely follow the line of the seatbelt across a person's chest. The photographs presented by the State show Lee suffered two distinct bruises, both on the left side of her chest but not where a seatbelt ordinarily lays. Moreover, there existed no evidence that Lee was involved in a collision or came into contact with any part of her vehicle when her tires blew out. Based on the totality of the evidence, we cannot conclude the trial court unreasonably rejected defendant's implication that the bruises were caused when Lee's tires blew out. See *People v. Saxon*, 374 Ill. App. 3d 409, 416-17 (2007).

¶ 151   Defendant also argues that some of the trial court's comments demonstrated the court had reasonable doubt of its guilt but believed the other-crimes evidence was outcome determinative. He notes the court stated that, had the other-crimes evidence not been admitted, it would have come to a different conclusion. When viewed in isolation, we can see why defendant may believe the court had doubt of his guilt and based its decision solely on the other-crimes evidence.

¶ 152   However, when viewed in context, the record shows the court found the State's evidence as a whole was sufficient to sustain the guilty finding, and we will not reweigh that evidence. See *People v. Williams*, 66 Ill. 2d 478, 485 (1977). Indeed, the court later clarified its findings, stating this was a difficult case, but it believed Lee's testimony, along with the other-crimes evidence, which had sufficient similarity to the charged offense and could be considered for propensity, established defendant's guilt. Accordingly, we reject defendant's challenge to the sufficiency of the evidence.

¶ 153                                   III. CONCLUSION

¶ 154   For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 155   Affirmed.